UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMIRA SALEM,

        Plaintiff,                    CIVIL ACTION NO. 04-72250

      v.                         DISTRICT JUDGE JOHN CORBETT O'MEARA

MS. YUKINS, MS DAVIS,         MAGISTRATE JUDGE VIRGINIA M. MORGAN
DR. SAWHNEY, DR. NICHOLS,
MS. EPP, MR. ARMSTRONG,
MS. JENKINSON, MS. ELLEN,
MS. HYNES, MS. BRYANT,
MR. HONOR, MS. NICHOLS,
MS. DOSANJH, MS. RAWLINS,
MS. RAGUCHAS, and MS. DAVIS,[1]

        Defendants.
_____/

## REPORT AND RECOMMENDATION

## I. Introduction

        Plaintiff, an inmate at the Robert Scott Correctional Facility (SCF) in Plymouth,

Michigan, filed a *pro se* civil rights action under 42 U.S.C. § 1983 against sixteen Michigan

Department of Corrections (MDOC) officials, alleging that they denied her necessary medical

care in violation of the Eighth Amendment. The matter comes before the Court on defendant

Sawhney's Motion for Summary Judgment (D/E #117) and defendants Bryant and Rawlins'

Motion for Summary Judgment (D/E #128). For the reasons discussed below, this Court

_____

[1]On February 22. 2005, the Honorable John Corbett O'Meara issued an order dismissing
all of the defendants except Sawhney, Bryant and Rawlins (D/E #59). Dr. Nichols was later
reinstated as a defendant (D/E #106). Sawhney, Bryant, Rawlins and Dr. Nichols are the only
defendants remaining in this action.

recommends that defendant Sawhney's motion for summary judgment be granted in part and that only the claim against her in count one of plaintiff's second amended complaint be allowed to proceed. This Court also recommends that defendants' Bryant and Rawlins' motion for summary judgment be granted in part and that only plaintiff's claims against them relating to her treatment for osteopenia be allowed to proceed.

## II. Background

### A. Factual Background

Plaintiff has been incarcerated in prison since August 8, 1997. (Plaintiff's Deposition, p. 19)[2] She was housed at SCF from August 8, 1997 through August 2, 2005. On August 2, 2005, plaintiff was transferred to the Huron Valley Women's Facility (WHV), where she is currently incarcerated. (Plaintiff's Deposition, pp. 19-20)

Plaintiff has a history of breast cancer. In 1994, plaintiff was diagnosed with breast cancer and had lumpectomy surgery. In 1995, plaintiff underwent chemotherapy and radiation. Since that time, plaintiff's cancer has been in remission. (Plaintiff's Deposition, p. 97)

Plaintiff underwent mammograms on December 3, 1998 and March 8, 2000. The findings of both of those mammograms were benign. (Reports, attached as part of Appendix IX to Plaintiff's Response to D/E #117)

On October 8, 2001, plaintiff was examined by Dr. John Axelson, an oncologist, and Dr. Axelson found no evidence of anything wrong with plaintiff. Dr. Axelson did, however, order an MRI of plaintiff's thoracic spine and a total body scan. (Clinic Consultation, attached as part

---

[2]Plaintiff's deposition is attached as Exhibit B to defendant Sawhney's Motion for Summary Judgment (D/E #117).

of Exhibit A to Plaintiff's Response to D/E #117)  The MRI was normal and it displayed no evidence of metastasis.  (MRI Report, attached as part of Exhibit A to Plaintiff's Response to D/E #117)

On November 1, 2001, plaintiff underwent the bone scan ordered by Dr. Axelson and she was subsequently examined by Dr. Malcolm S. Trimble.  According to Dr. Trimble, the bone scan revealed an increased uptake at T8, which was "concerning for metastatic disease."  The bone scan also showed a solitary lesion in plaintiff's mid-thoracic spine.  Dr. Trimble ordered an MRI of plaintiff's T-spine.  (Clinic Consultation, pp. 208, 221, attached as part of Sawhney's Exhibit A)[3]  A December 19, 2001 MRI revealed no bony abnormalities in plaintiff's thoracic spine or spinal cord.  (MRI Report, p. 208 of Sawhney's Exhibit A)

On November 7, 2001, plaintiff had another mammogram.  That mammogram revealed plaintiff's previous lumpectomy and radiation, but no suspicious calcifications or significant abnormalities.  The assessment was benign, pending comparison with previous mammograms. (Mammography Report, p. 227 of Sawhney's Exhibit A; also attached as part of Appendix VIII to Plaintiff's Response to D/E #117 and as part of Exhibit F to Plaintiff's Response to D/E #128) On December 19, 2001, that mammogram was compared to previous mammograms and the final assessment was again benign.  (Mammography Report, attached as part of Appendix VIII to Plaintiff's Response to #117 and as part of Exhibit F to Plaintiff's Response to D/E #128)

On January 25, 2002, plaintiff underwent surgery to remove a lesion from her left shoulder and arm.  According to the discharge instructions issued after that surgery, plaintiff's

---

[3]The page numbers of defendant Sawhney's Exhibit A refer to the Bates-stamped page numbers of plaintiff's medical records.

sutures were to be removed on February 3, 2002 at SCF. (Discharge Instructions dated January 25, 2002, attached as Appendix I to Plaintiff's Response to D/E #117)

On February 14, 2002, plaintiff visited Dr. Axelson for a appointment following up on plaintiff's previous breast cancer. Upon examination, Dr. Axelson found a "right supraclavicular lymph node" that he believed was most likely benign. However, Dr. Axelson did refer plaintiff to Dr. Gregory Casey for a lymph node biopsy in order to be sure the lymph node was benign. Additionally, after noting that plaintiff was complaining of back pain and that she had an abnormal bone scan, Dr. Axelson recommended both that plaintiff undergo a bone densitometry study along with thoracic films and that plaintiff start taking the medication Fosamax for osteopenia and osteoporosis prevention. (Clinic Consultation, pp. 208-209 of Sawhney's Exhibit A; also attached as Appendix XIII to Plaintiff's Response to D/E #117 and as part of Exhibit B to plaintiff's response to D/E #128)

Both plaintiff's progress notes and a specialty consult report reflect that plaintiff was to return to the clinic at the Duane Waters Hospital for a follow-up visit with Dr. Axelson in three months. (pp. 83, 142 of Sawhney's Exhibit A; also attached as part of Appendix VI to Plaintiff's Response to D/E #117 and as part of Exhibit B to Plaintiff's Response to D/E #128) According to her affidavit, inmate Donna Trapani heard Dr. Axelson advise plaintiff of plaintiff's treatment and she saw Dr. Axelson hand a transportation officer a 409 form regarding plaintiff's return visit. (Affidavit of Donna Trapani, attached as part of Attachment A to Plaintiff's Response to D/E #117) Although plaintiff could not produce any such form, she also recalls seeing a 409 form in her medical file. (Plaintiff's Deposition, pp. 53-54)

On February 21, 2002, plaintiff underwent surgery to excise lesions from her left ear and right arm. According to the discharge instructions issued after that surgery, plaintiff's sutures were to be removed on February 23, 2002 at SCF. (Discharge Instructions dated February 21, 2002, attached as Appendix II to Plaintiff's Response to #117) According to plaintiff, she personally spoke with Sawhney about Sawhney removing plaintiff's sutures, (Plaintiff's Deposition, p. 102), but Sawhney failed to remove them and plaintiff eventually had another inmate remove the sutures with a pair of scissors, a pair of tweezers, and pink disinfectant. (Affidavit of Pamela Gordon, D/E #129)

An April 1, 2002 bone density study showed that plaintiff had osteopenia. (Report, pp. 200-201 of Sawhney's Exhibit A)

On July 9, 2002, Dr. Casey conducted a needle aspiration biopsy on the area of supraclavicular adenopathy. (Clinic Consultation, pp.188-189 of Sawhney's Exhibit A; Appendix VII to Plaintiff's Response to D/E #117) That biopsy did not identify any tumor cells and the tissue came back as showing normal lymphoid appearing tissue. (Progress Notes and Clinic Consultations, pp. 72, 175, 182 of Sawhney's Exhibit A)

On November 12, 2002, Dr. Casey saw plaintiff by "telemed" because, despite the benign findings of plaintiff's tests, plaintiff had stated that the area of her neck where the lymphoid was had increased in size since Dr. Casey last saw her. Dr. Casey recommended that plaintiff be sent to see him in two weeks, (Clinic Consultation, p. 182 of Sawhney's Exhibit A; also attached as part of Appendix VI to Plaintiff's Response to D/E #117))

On November 26, 2002, Dr. Casey examined plaintiff at the clinic. Dr. Casey found that plaintiff's lymph nodes at the base of the right side of her neck had increased and, therefore, he

recommended that plaintiff be taken in for a formal excisional biopsy of at least one of the lymph nodes. Dr. Casey also stated that, because plaintiff has a history of thyroid disease, he would arrange a consultation with Dr. Qutob, an endocrinologist. (Clinic Consultation, p. 175 of Sawhney's Exhibit A; also attached as part of Appendix XI to Plaintiff's Response to D/E #117 and as part of Exhibit C to Plaintiff's Response to D/E #128)

CMS approved the biopsy recommended by Dr. Casey (CMS Authorization Request and Response, pp. 30-31, 66 of Sawhney's Exhibit A) and, on January 10, 2003, Dr. Casey performed a "Supraclavicular exploration of the middle triangle of the neck with no identification of lymphadenopathy." (Operative Report, p. 159 of Sawhney's Exhibit A) That operation did not reveal any evidence of any gross lymphadenopathy. (Operative Report, pp. 159-160 of Sawhney's Exhibit A)

On January 24, 2003, plaintiff completed a Prisoner Medication Re-Order Form requesting refills of Fosamax, Vitamin E, Levoxyl, Vitamin A and Oyster Shell Calcium. (Prisoner Medication Re-Order Form, January 24, 2003, attached as part of Exhibit 6 to Plaintiff's Deposition)[4] On February 2, 2003, plaintiff sent in a Prisoner Medication Re-Order Form requesting refills of Fosamax, Oyster Shell Calcium, Vitamin E and Levoxyl. (Prisoner Medication Re-Order Form, February 2, 2003, attached as part of Exhibit 6 to Plaintiff's Deposition) On February 7, 2003, plaintiff sent in a Prisoner Medication Re-Order Form requesting refills of Oyster Shell Calcium, Fosamax, and Vitamin E. (Prisoner Medication Re-Order Form, February 2, 2003, attached as part of Exhibit 6 to Plaintiff's Deposition) On

---

[4]The exhibits to plaintiff's deposition are attached as part of Exhibit B to defendant Sawhney's Motion for Summary Judgment (D/E #117).

February 8, 2003, plaintiff sent in a Health Care Request, addressed to Sawhney, requesting that her medications be refilled.  In the response, an unidentified person wrote that doctors do not process kites and plaintiff should send in the proper form.  (Health Care Request and Response, attached as Exhibit 7 to Plaintiff's Deposition)

On March 3, 2003, plaintiff sent a medical kite, addressed to Bryant, regarding Dr. Axelson's request to see plaintiff within three months of plaintiff's February 14, 2002 examination and Dr. Casey's statement that he would arrange for plaintiff to see an endocrinologist.  (Medical Kite, March 4, 2003, attached as Exhibit 1 to Plaintiff's Deposition)

On March 18, 2003, plaintiff met with Sawhney.  According to MDOC progress notes, plaintiff wanted to see her oncologist and the endocrinologist recommended by Dr. Casey. Sawhney wrote that plaintiff was very demanding and that he would review plaintiff progress notes and speak with the off site coordinator.  (Progress Notes, p. 64 of Sawhney's Exhibit A)

On May 16, 2003, plaintiff sent in a Prisoner Medication Order Form requesting refills of Vitamin D, Levoxyl, Naproxen, Vitamin E, Fosamax and Oyster Shell Calcium.  (Prisoner Medication Order Form, May 16, 2003, attached as part of Exhibit 8 to Plaintiff's Deposition)

On May 22, 2003, plaintiff again met with Sawhney to complain of pain in both breasts. While Sawhney did not find any change in skin color or lymphadenopathy, she ordered a mammogram and chest x-ray.  (Progress Notes, p. 59 of Sawhney's Exhibit A; Plaintiff's Deposition, p. 129)  The chest x-ray was performed that day and it revealed normal findings and no active pulmonary disease.  (Radiology Request and Report, p. 124 of Sawhney's Exhibit A)

On June 5, 2003, plaintiff sent in a Prisoner Medication Order Form requesting refills of Levoxyl, Naproxen, and Vitamin D. (Prisoner Medication Order Form, June 5, 2003, attached as part of Exhibit 8 to Plaintiff's Deposition)

On June 9, 2003, the MDOC progress notes for plaintiff provided that plaintiff kept sending in kites stating that she need to see Dr. Axelson and Dr. Casey. The progress notes also stated that Sawhney had reviewed plaintiff's file and found there was no 409 form for a return visit with Dr. Axelson or Dr. Casey. (Progress Notes, p. 58 of Sawhney's Exhibit A)

On June 12, 2003, plaintiff sent in a Prisoner Medication Re-Order Form requesting refills of Levoxyl, Naproxen, and Vitamin D. (Prisoner Medication Re-Order Form, June 12, 2003, attached as part of Exhibit 9 to Plaintiff's Deposition) On June 13, 2003, plaintiff sent in a Prisoner Medication Re-Order Form requesting refills of Oyster Shell Calcium and Fosamax. (Prisoner Medication Re-Order Form, June 13, 2003, attached as part of Exhibit 9 to Plaintiff's Deposition) On June 18, 2003, plaintiff sent in a Prisoner Medication Re-Order Form requesting refills of Naproxen and Oyster Shell Calcium. (Prisoner Medication Re-Order Form, June 18, 2003, attached as part of Exhibit 9 to Plaintiff's Deposition) On June 21, 2003, plaintiff sent in a Prisoner Medication Re-Order Form requesting a refill of her Naproxen medication. (Prisoner Medication Re-Order Form, June 21, 2003, attached as part of Exhibit 9 to Plaintiff's Deposition) On June 28, 2003, plaintiff sent in a Prisoner Medication Order Form requesting a refill of her Naproxen medication. (Prisoner Medication Order Form, June 28, 2003, attached as part of Exhibit 9 to Plaintiff's Deposition)

According to plaintiff, she was scheduled to undergo a mammogram on July 1, 2003, but the mammogram was scheduled for the wrong location and, therefore, not done.  (Plaintiff's Deposition, pp. 48-49)

On July 8, 2003, plaintiff visited with Sawhney and, according to Sawhney's notes, demanded a fan, a chest x-ray report and a bone density test.  Sawhney also noted that she reviewed plaintiff's file and there was no need for repeat tests.  Sawhney further noted that she had seen plaintiff around the prison and plaintiff did not appear to have any pain.  (Progress Notes, p. 56 of Sawhney's Exhibit A)

On July 24, 2003, CMS authorized a diagnostic mammogram.  (CMS Authorization Request, p. 28 of Sawhney's Exhibit A)  On July 25, 2003, plaintiff was examined by Dr. Sati Nichols.  While plaintiff complained of pain in her right breast, Dr. Nichols did not find anything abnormal.  Dr. Nichols did note that Sawhney had already ordered a mammogram.  (Progress Notes, p. 55 of Sawhney's Exhibit A)

On August 8, 2003, plaintiff again visited with Sawhney and complained that she needed to see Dr. Axelson and have a bone density scan.  (Progress Notes, p. 54 of Sawhney's Exhibit A)

On August 19, 2003, plaintiff sent a Health Care Request, addressed to Bryant, requesting that a mammogram be scheduled.  In a response dated August 22, 2003, an unidentified person wrote that Sawhney had already requested that a mammogram be performed, but because it had to be performed off-site, CMS approval was needed.  The response also stated that Bryant would check on the "hold-up" in getting CMS approval.  (Health Care Request and Response, attached as Exhibit 2 to Plaintiff's Deposition)

On September 8, 2003, plaintiff sent another Health Care Request addressed to Bryant. In that request, plaintiff stated that the pain in her breast had increased since her previous request and she needed a mammogram. (Health Care Request, attached as Exhibit 3 to Plaintiff's Deposition)

On September 9, 2003, plaintiff underwent a bilateral diagnostic mammogram. The radiology report from that date found the presence of a few benign-appearing calcifications. There were no suspicious cluster of microcalcifications. (Radiology Report, p. 156 of Sawhney's Exhibit A; also attached as part of Appendix IX to Plaintiff's Response to D/E #117) That report was also compared with previous mammograms and it was determined that the calcifications were stable. It was also recommended that a follow-up mammogram be made in one year. (Radiology Report, p. 157 of Sawhney's Exhibit A; also attached as part of Appendix IX to Plaintiff's Response to D/E #117)

On April 27, 2004, plaintiff visited Sawhney and complained about an enlarged lymph node on the right side of her neck, a sore throat and pain in her hip. Sawhney found a dime sized lump, prescribed medication and ordered an x-ray of plaintiff's hip. (Progress Notes, p. 47 of Sawhney's Exhibit A; Plaintiff's Deposition, p. 151)

On May 1, 2004, CMS approved a needle biopsy of the right side of plaintiff's neck. (CMS Authorization Request, p. 18 of Sawhney's Exhibit A)

On May 11, 2004, plaintiff again visited Sawhney stating that she needed to see an oncologist and complaining about the lump on her neck. In response, Sawhney noted that there was no documentation providing for a visit to an oncologist and that plaintiff's last visit to an

oncologist had been in February of 2002.  Sawhney also noted that she would refer plaintiff for a biopsy.  (Progress Notes, p. 45 of Sawhney's Exhibit A)

On June 6, 2004, CMS again approved a biopsy of the right side of plaintiff's neck. (CMS Authorization Request, p. 14 of Sawhney's Exhibit A)  The right cervical neck lymph node biopsy was performed on July 14, 2004 and it showed no evidence of lymphoma or other malignancy.  (Progress Notes and Surgical Pathology Report, pp. 40, 113 of Sawhney's Exhibit A)

On June 24, 2004, plaintiff sent a memo, addressed to Ms. Butler, plaintiff's health care manager, requesting a meeting to discuss plaintiff's ongoing health concerns.  On July 15, 2004, Butler requested a statement of plaintiff's concerns so that Butler could be aware of plaintiff's issues prior to meeting with plaintiff.  (Memo and Response, attached as Exhibit 5 to Plaintiff's Deposition)

On July 19, 2004, Nurse Nichols examined plaintiff after plaintiff complained of bilateral nipple discharge, but plaintiff was unable to describe the frequency or onset of the claimed discharge.  Nurse Nichols found no discharge from the right nipple and only pinhead size discharge from the left.  Nurse Nichols told plaintiff she would request a referral for plaintiff. (Progress Notes, p. 42 of Sawhney's Exhibit A)  A request for a referral to evaluate the discharge was made that same day and, on July 21, 2004, CMS approved a diagnostic mammogram.  (CMS Authorization Request, pp. 8, 11 of Sawhney's Exhibit A)  That mammogram was conducted on August 4, 2004 and it revealed no radiographic evidence of malignancy in the left breast. (Report, p. 150 of Sawhney's Exhibit A; also attached as part of Exhibit A to Plaintiff's Response to D/E #117)

On August 19, 2004, plaintiff met with a Health Unit Manager to discuss her numerous concerns, including plaintiff's concerns regarding her visits to specialists and her medications. The Health Unit Manager said she would speak to Sawhney at the next possible date.  (Progress Notes, p. 39 of Sawhney's Exhibit A)

On August 20, 2004, a request was made for a consult with Dr. Axelson (CMS Authorization Request, p. 5 of Sawhney's Exhibit A; also attached as part of Appendix VI to Plaintiff's Response to D/E #117), but plaintiff's progress notes provide that, on September 27, 2004, Dr. David Prough's office was called about the consult and Dr. Prough's nurse said that Dr. Prough had said there was no need for plaintiff to see Dr. Axelson because all of plaintiff's tests were negative (Progress Notes, p. 39 of Sawhney's Exhibit A).  Plaintiff's progress notes for September 28, 2004 indicate that, while Dr. Prough wrote an order sheet stating that plaintiff should be seen by Dr. Axelson, he did not mention such a visit in the 409 report.  The progress notes for that date also indicate the need for a decision  (Progress Notes, p. 38 of Sawhney's Exhibit A)

The progress notes for October 7, 2004 indicate that Dr. Prough called Sawhney and discussed plaintiff's health.  Sawhney asked for the reason to send plaintiff to see Dr. Axelson and Dr. Prough responded that, while there was no such reason, plaintiff insisted that she be seen by an oncologist.  Sawhney then requested a follow-up statement from Dr. Prough.  (Progress Notes, p. 37 of Sawhney's Exhibit A)  Dr. Prough wrote the follow-up statement that day.  In a letter to Sawhney, Dr. Prough wrote that, while in his opinion everything was fine, plaintiff has apparently been complaining to Sawhney about the possibility of her having malignancy.  Dr. Prough also wrote that he did not recall ordering a referral to Dr. Axelson and that, if he did, it

was only in reaction to plaintiff's persistence and hysteria. Dr. Prough further wrote that, given plaintiff's persistent concerns, plaintiff may benefit from a visit to Dr. Axelson and hearing that she was fine directly from him. (Letter, pp. 147-148 of Sawhney's Exhibit A)

On October 14, 2004, plaintiff and Sawhney spoke about plaintiff's health. (Progress Notes, p. 36 of Sawhney's Exhibit A) At that meeting, plaintiff acknowledged that Dr. Prough had stated she did not need a referral to see Dr. Axelson. (Plaintiff's Deposition, p. 114)

On January 20, 2005, plaintiff was examined by Dr. Nichols, who referred plaintiff's specific questions regarding osteoporosis and her thyroid to the medical service provider at the chronic care. (Progress Notes, p. 649 of Sawhney's Exhibit A)

On March 3, 2005, the Garcia Laboratory issued a report regarding plaintiff that included a finding that plaintiff's cholesterol was 314 mg/dl. According to that report, "high" cholesterol is greater than or equal to 240 mg/dl. (Garcia Laboratory Report, March 3, 2005, attached as Appendix V to Plaintiff's Response to D/E #117)

On March 4, 2005, plaintiff requested a mammogram. Plaintiff also asked about why she had not been referred to Dr. Axelson for her osteoporosis and whoever wrote the progress notes responded that there was no need for a referral because plaintiff was already receiving the necessary treatment. (Progress Notes, p. 646 of Sawhney's Exhibit A)

On April 20, 2005, plaintiff was again informed that her osteoporosis would be treated by her medical service provided and not by her oncologist. Plaintiff was also informed that her mammogram was pending. (Progress Notes, p. 357 of Sawhney's Exhibit A)

On May 12, 2005, plaintiff underwent a bilateral diagnostic mammogram. The results of that mammogram were normal. (Letter, p. 422 of Sawhney's Exhibit A; also attached as part of Exhibit A to Plaintiff's Response to D/E #117)

On August 31, 2005, Dr. Nichols wrote that he had reviewed plaintiff's records and, while plaintiff continued to have complaints and concerns, she is receiving the appropriate medical care and does not need to see any outside specialists. Dr. Nichols also recommended that plaintiff receive annual mammograms. (Progress Notes, p. 347 of Sawhney's Exhibit A)

On May 12, 2006, plaintiff underwent a bilateral diagnostic mammogram. There was no evidence of malignancy in either breast and all findings were benign. (Report, pp. 482-483 of Sawhney's Exhibit A) On June 6, 2006, another breast exam was done and there were no changes in plaintiff's condition. (Progress Notes, p. 330 of Sawhney's Exhibit A)

On January 22, 2007, plaintiff underwent a whole body scan. That scan revealed an "Abnormal increased concentration of radioactivity in the junction of body and manubrium sterni, and in the multiple (3) mid dorsal vertebrae, most likely due to metastasis" and "Abnormal uptake in the bilateral tibial shafts, most likely due to shin splints. Posterior arthopathy is less likely as a possibility. Clinical correlation of the plain radiographs of both tibias and fibulas is suggested for further evaluation." No other areas of abnormal changes in concentration of radioactivity were seen in plaintiff's skeleton. (Report, attached as part of Appendix X to Plaintiff's Response to D/E #117 and as Exhibit H to Plaintiff's Response to D/E #128)[5]

---

[5]Part of that report is also attached as p. 418 of Sawhney's Exhibit A.

On January 23, 2007, an x-ray of plaintiff's thoracic spine demonstrated no evidence of any significant changed and minimal degenerative disk disease changes. (Radiology Report, p. 533 of Sawhney's Exhibit A) An x-ray of plaintiff's cervical spine taken on the same day was also negative. (Radiology Report, p. 534 of Sawhney's Exhibit A)

On March 6, 2007, plaintiff underwent an MRI of her thoracic spine. That MRI revealed no evidence of metastatic lesion or osseous fracture (Report, p. 411 of Sawhney's Exhibit A; also attached as part of Appendix X to Plaintiff's Response to D/E #117) while further x-rays showed mild degenerative changes of the mid thoracic spine and no evidence of metastatic disease to bone (Report, p. 412; also attached as part of Appendix X to Plaintiff's Response to D/E #117).

On June 6, 2007, plaintiff underwent a bilateral diagnostic mammogram. That mammogram revealed no radiographic evidence of malignancy. (Radiology Report, pp. 408-409 of Sawhney's Exhibit A; also attached as part of Exhibit A to Plaintiff's Response to D/E #117)

Further facts will be included in the discussion section as needed.

**B. Procedural Background**

On June 29, 2004, plaintiff filed this *pro se* civil rights action under 42 U.S.C. § 1983 against sixteen prison officials, alleging that they violated her rights under the Eighth Amendment (D/E #3). On February 22, 2005, Judge O'Meara entered an order

adopting this Court's Report and Recommendation that the plaintiff's complaint be dismissed as to some of the claims because they were not administratively and procedurally exhausted. That order also adopted this Court's recommendation that plaintiff be allowed to amend her complaint within twenty-one (21) days, so as to only include her exhausted claims. (D/E #59)

On January 5, 2005, plaintiff filed her second amended complaint (D/E #50). In that complaint, plaintiff alleges seven claims against Sawhney, Bryant and Rawlins. The first claim arises from Sawhney's alleged failure to remove sutures from plaintiff's left ear and left arm. Plaintiff alleges that on February 21, 2002, she underwent surgery on her left ear and left arm at Duane Waters Hospital in Jackson, Michigan. Sutures were placed in her left ear and left arm following the surgery. Upon her return to SCF from the hospital, plaintiff advised Sawhney that according to the surgeon's instructions, the sutures in her left ear were to be removed in eight days, and the sutures in her left arm were to be removed in nine days. When the sutures were not removed within the time frame set forth in the surgeon's instructions, plaintiff requested an appointment with Sawhney. Plaintiff was scheduled to see Sawhney on March 11, 2002, but the appointment was cancelled, and no subsequent appointment was made. Plaintiff eventually had another inmate remove the sutures, which had become ingrown, red, and irritated. Plaintiff alleges that Sawhney's failure to remove the sutures in a timely manner constituted deliberate indifference to her medical needs.

Counts two, three, four and six of the second amended complaint are based upon Sawhney and Rawlins' alleged failure to provide plaintiff with certain prescribed medications in a timely manner. Plaintiff alleges that she saw an oncologist on February 14, 2002, and that the oncologist diagnosed her with osteoporosis, which plaintiff claims was a result of the

chemotherapy she underwent for breast cancer.  The oncologist prescribed four medications to treat plaintiff's osteoporosis:  Fosamax, Calcium, Vitamin D, and Vitamin E.  In addition, plaintiff suffers from hyperthyroidism and was prescribed Levoxyl for that condition.  Plaintiff was also prescribed Naproxin for severe migraine headaches.  Plaintiff alleges that despite her numerous requests, and despite the filing of several grievances, the prescriptions were either not filled at all or were not filled in a timely manner, causing her joint pain, undue suffering, and other physical damage.

Plaintiff alleges in count five of the amended complaint that Sawhney failed to provide her with necessary mammograms in a timely manner and that when a mammogram was finally performed, they refused to provide her with the results thereof.  In count seven, plaintiff alleges that she was improperly denied access to her oncologist and endocrinologist by Sawhney and Bryant, and that she was improperly denied access to a gynecologist by Sawhney.

On July 13, 2005, the district judge entered an order adopting this Court's Report and Recommendation that plaintiff's second amended complaint be dismissed (D/E #81).  That dismissal was based on a retroactive application of <u>Jones Bey v. Johnson</u>, 407 F.3d 801 (6th Cir. 2005), in which the Sixth Circuit instructed the district courts that they must completely dismiss all complaints with mixed exhausted and unexhausted claims.  Judgment was then entered in favor of the remaining defendants (D/E #82).

Plaintiff subsequently appealed the dismissal of her complaint (D/E #89) and, on June 14, 2007, the Sixth Circuit entered an order vacated the district court's order and remanding this case for further proceedings (D/E #92).  The Sixth Circuit's decision was based on the holding of a United States Supreme Court case decided after plaintiff's case was dismissed, <u>Jones v. Bock</u>,

127 S.Ct. 910 (2007). In <u>Jones</u>, the Supreme Court held, in the pertinent part, that where a complaint contains both exhausted and unexhausted claims, the district court should proceed with the exhausted claims while dismissing the unexhausted claims, rather than dismissing the complaint in its entirety. <u>Jones</u>, 127 S.Ct. at 923-925.

On November 16, 2007, defendant Sawhney filed a motion for summary judgment (D/E #117). In that motion, Sawhney argues that she is entitled to summary judgment because plaintiff did not have a serious medical need given the medical evidence demonstrating that plaintiff is free of cancer and other dangerous conditions. Sawhney also argues that she is entitled to summary judgment because she was not deliberately indifferent to plaintiff's medical needs. According to Sawhney, there is no evidence that she was aware of plaintiff's complaints or that she cancelled appointments, she did provide plaintiff with adequate medical care, and there is no evidence of the requisite subjective intent. Sawhney further argues that, assuming she did delay plaintiff's treatment, a delay without further injury does not constitute deliberate indifference and there was no injury caused by any delay in this case.

On February 28, 2008, plaintiff filed a response to Sawhney's motion for summary judgment (D/E #128). In that response, plaintiff argues that Sawhney was deliberately indifferent to plaintiff's serious medical needs in four areas: the removal of plaintiff's sutures following surgery, the re-ordering of plaintiff's medications, the ordering of plaintiff's mammograms, and authorizing plaintiff's visits to specialists. According to plaintiff, Sawhney was aware of plaintiff's needs because plaintiff personally informed her of some and sent kites/grievances regarding the others. Plaintiff also argues that she has suffered pain and permanent damage to her bones because of Sawhney's deliberate indifference.

On March 5, 2005, defendants Bryant and Rawlins filed a motion for summary judgment (D/E #128). In that motion, Bryant argues that she is entitled to summary judgment because she was not personally involved with the alleged constitutional violations that occurred in 2002 and plaintiff did not suffer any injuries from the alleged delays in treatment that occurred after 2002. Rawlins argues that she is entitled to summary judgment because there is no evidence supporting plaintiff's claim against Rawlins and plaintiff has no medical documentation to support her claim that she suffered any harm.

On May 6, 2008, plaintiff filed a response to Bryant and Rawlins' motion for summary judgment (D/E #132). In that response, plaintiff argues that Bryant's affidavit contains perjury and that Bryant was deliberately indifferent to plaintiff's medical needs by failing to schedule the appointments plaintiff needed with specialists, despite the fact that those appointments were authorized by CMS and Bryant was aware of plaintiff's needs. Plaintiff also argues that Rawlins repeatedly delayed refilling plaintiff's medications and that plaintiff was without certain medications from February 3, 2003 to March 24, 2003, May 29, 2003 to July 8, 2003 and September 2. 2003 to November 5, 2003. Plaintiff further argues that defendants' deliberate indifference caused permanent damage to plaintiff's bones and plaintiff's high cholesterol.

## III. Standard of Review

Defendants all move for summary judgment pursuant to Federal Rule of Civil Procedure 56(b), which states that "[a] party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move without or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof." Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-movant. See Matsushita Electric Industrial Co., Ltd. et al. v. Zenith Radio Corp., et. al., 475 U.S. 547, 587, 106 S.Ct. 1348, 1356 (1986); see also B.F. Goodrich Co. v. U.S. Filter Corp., 245 F.3d 587, 591-92 (6th Cir. 2001). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Once the moving party has carried his burden, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita, 475 U.S. at 587, 106 S.Ct. 1348. The opposing party cannot merely rest upon the allegations contained in his pleadings. Rather, he must submit evidence demonstrating that material issues of fact exist. Banks v. Wolfe County Bd. of Educ., 330 F.3d 888, 892 (6th Cir. 2003); Fed. R. Civ. P. 56(e). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587, 106 S.Ct. 1348 (quoting First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 289, 88 S.Ct. 1575, 1592 (1968)).[6]

---

[6]Bryant and Rawlins also argue that they are entitled to qualified immunity because there was no constitutional violation. Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." Saucier v. Katz, 533 U.S. 194, 200; 121 S.Ct. 2151; 150 L.Ed.2d 272 (2001), quoting Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). However, a "court should not grant summary judgment on the issue of qualified immunity if there exists a genuine issue of material fact, 'involving an issue on which the question of immunity turns'" such as whether there was a constitutional violation, Flint ex rel. Flint v. Kentucky Dept. of Corrections, 270 F.3d 340, 346-347 (6th Cir. 2001) quoting Poe v.

**IV. Discussion**

A prisoner's claim that his constitutional right to medical treatment was violated is analyzed under the Eighth Amendment. See Estelle v. Gamble, 429 U.S. 97, 103-104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). To state a § 1983 claim for a violation of a prisoner's Eighth Amendment rights due to inadequate medical care, the prisoner must allege facts evidencing a deliberate indifference to serious medical needs. Wilson v. Seiter, 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). To succeed on a claim of deliberate indifference, plaintiff must satisfy two elements, an objective one and a subjective one. Wilson, 501 U.S. at 300.

The objective component is satisfied by a showing that plaintiff had a serious medical need. Wilson, 501 U.S. at 297. As clarified by the Sixth Circuit, a reviewing court should first determine whether the injury is "obvious," i.e. "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Blackmore v. Kalamazoo County, 390 F.3d 890, 897 (6th Cir. 2004), quoting Gaudreault v. Municipality of Salem, 923 F.2d 203, 208 (1st Cir. 1990). "'Where the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person,' this obviousness is itself sufficient to satisfy the objective component of the adequate medical care test." Johnson v. Karnes, 398 F.3d 868, 874 (6th Cir. 2005), quoting Blackmore v. Kalamazoo County, 390 F.3d 890, 899 (6th Cir. 2004). Therefore, if there is an obvious need for medical

---

Haydon, 853 F.2d 418, 425-426 (6th Cir. 1988), and, therefore, there is no need for a separate qualified immunity analysis in this case.

treatment, then the court must only determine whether the delay in securing that care was reasonable.  Blackmore, 390 F.3d at 899-900.

 If, however, the need involves minor needs or non-obvious complaints of a serious need for medical care, the plaintiff "'must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment.'"  Johnson, 398 F.3d at 874, quoting Napier v. Madison County, Kentucky, 238 F.3d 739, 742 (6th Cir. 2001).  As stated in Blackmore, Napier controls in cases where the injury is not apparent or appears to be relatively minor:

> In sum, the "verifying medical evidence" requirement is relevant to those claims involving minor maladies or non-obvious complaints of a serious need for medical care.... In a word, Napier does not apply to medical care claims where facts show an obvious need for medical care that laymen would readily discern as requiring prompt medical attention by competent health care providers. Napier applies where the plaintiff's "deliberate indifference" claim is based on the prison's failure to treat a condition adequately, or  where the prisoner's affliction is seemingly minor or non-obvious.  In such circumstances, medical proof is necessary to assess whether the delay caused a serious medical injury. [Blackmore, 390 F.3d at 898. citing Napier, 238 F.3d at 742.]

 To satisfy the subjective component of the adequate medical care test, the plaintiff must demonstrate that the defendant "subjectively perceived a risk of harm and then disregarded it." Comstock v. McCrary, 273 F.3d 693, 703 (6th Cir. 2001).  Deliberate indifference is characterized by obduracy and wantonness, not inadvertence or good faith error.  Gibson v. Foltz, 963 F.2d 851, 853 (6th Cir. 1992).  Moreover, where the prisoner has received some medical attention and the dispute is over the adequacy of the treatment, courts are reluctant to

second guess medical judgments, <u>Westlake v. Lucas</u>, 537 F.2d 857, 860 n. 5 (6th Cir. 1976), and deliberate indifference does not include negligence in diagnosing a medical condition.  <u>Sanderfer v. Nichols</u>, 62 F.3d 151, 154 (6th Cir. 1995) (citations omitted).  However, it is not necessary for a plaintiff to "show that the official acted 'for the very purpose of causing harm or with knowledge that harm will result.'"  <u>Comstock</u>, 273 F.3d at 703, quoting <u>Farmer</u>, 511 U.S. at 835.  Put simply, "deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk."  <u>Comstock</u>, 273 F.3d at 703, quoting <u>Farmer</u>, 511 U.S. at 835.

### A. Sawhney

As discussed above, plaintiff alleges that Sawhney was deliberately indifferent to plaintiff's serious medical needs by failing to remove plaintiff's sutures following plaintiff's surgery, failing to provide plaintiff with mammograms in a timely manner, failing to provide plaintiff with certain prescribed medications in a timely manner, and improperly denying plaintiff access to certain specialists.  (D/E #50)

### 1. Sutures

Plaintiff's first deliberate indifference claim against Sawhney arises out of Sawhney's alleged failure to remove sutures from plaintiff's left ear and left arm following the surgery performed on plaintiff's left ear and left arm on February 21, 2002.  Sawhney argues that she is entitled to summary judgment on that claim because plaintiff has no proof that Sawhney was aware that the sutures needed to be removed.

As discussed above, the party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact and, if the moving party meets that

initial burden, the party opposing the motion must come forward with specific facts showing

that there is a genuine issue for trial. <u>Matsushita</u>, 475 U.S. at 587; Fed. R. Civ. P. 56(e). In this

case, Sawhney has met her initial burden of demonstrating the absence of a genuine issue of

material fact by pointing to a portion of plaintiff's deposition testimony where plaintiff concedes

that she has no proof that Sawhney was aware that the sutures needed to be removed.[7]

However, while Sawhney met her initial burden, plaintiff has responded with specific

facts showing that there is an issue for trial. The discharge instructions issued after plaintiff's

surgery state that plaintiff's sutures were to be removed on February 23, 2002 at SCF[8] and

plaintiff testified at her deposition that she personally spoke with Sawhney about Sawhney

removing plaintiff's sutures.[9] While Sawhney correctly notes that plaintiff's evidence does not

prove that Sawhney was aware that the sutures needed to be removed, that evidence submitted

by plaintiff could lead a rational trier of fact to find for plaintiff and, therefore, Sawhney is not

entitled to summary judgment on plaintiff's claim in count one. <u>Matsushita</u>, 475 U.S. at 587,

106 S.Ct. 1348.

**2. Mammograms**

Plaintiff alleges in count five of the amended complaint that Sawhney failed to provide

her with necessary mammograms in a timely manner and that when a mammogram was finally

performed, they refused to provide her with the results thereof. With respect to that claim,

_____

[7]Plaintiff's Deposition, pp. 103-109.

[8]Discharge Instructions dated February 21, 2002, attached as Appendix II to Plaintiff's Response to #117.

[9]Plaintiff's Deposition, p. 102.

Sawhney argues that she is entitled to summary judgment because no genuine issue of material fact exists as to either the objective component or the subjective component of plaintiff's claim; according to Sawhney, plaintiff did not have a serious medical need and Sawhney was not deliberately indifferent to any serious medical need plaintiff did have.

**a. Objective Component**

As discussed above, where, as here, the plaintiff has non-obvious complaints of a serious need for medical care, the plaintiff "'must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment.'" Johnson, 398 F.3d at 874, quoting Napier, 238 F.3d at 742. In this case, no genuine issue of material fact exists with respect to whether plaintiff suffered any injury from a delay in receiving mammograms. Plaintiff did not undergo any mammograms between November 7, 2001 and September 9, 2003.[10] However, that September 9, 2003 mammogram only revealed the presence of a few benign-appearing calcifications and there were no suspicious clusters of microcalcifications. Moreover, when that report was compared with previous mammograms it was determined that the calcifications were stable.[11] Subsequently, plaintiff underwent mammograms on August 4, 2004, May 12, 2005, May 12, 2006 and June 6, 2007. As detailed above, all of those

---

[10]Mammography Report, p. 277 of Sawhney's Exhibit A; also attached as part of Appendix VIII to Plaintiff's Response to D/E #117 and as part of Exhibit F to Plaintiff's Response to D/E #128; Radiology Report, p. 156 of Sawhney's Exhibit A; also attached as part of Appendix IX to Plaintiff's Response to D/E #117.

[11]Radiology Report, p. 157 of Sawhney's Exhibit A; also attached as part of Appendix IX to Plaintiff's Response to D/E #117.

mammograms were negative.[12]  Plaintiff herself concedes that her cancer has been in remission since 1995.[13]  Given that concession, as well as the results of the numerous mammograms performed since the gap in plaintiff's treatment, it is clear that no genuine issue of material fact exists as to whether plaintiff suffered any injury from a delay in receiving mammograms. Therefore, plaintiff did not have a serious medical need and Sawhney is entitled to summary judgment on plaintiff's claim regarding timely mammograms.

### b. Subjective Component

Given the above analysis, it is not necessary for the Court to address Sawhney's arguments regarding the subjective component of plaintiff's claim that Sawhney was deliberately indifferent to plaintiff's serious medical needs by failing to provide plaintiff with necessary mammograms in a timely manner, but this Court will do so for the sake of thoroughness.  In this case, Sawhney argues that she was not deliberately indifferent to any serious medical need plaintiff did have.

As discussed above, plaintiff did not undergo any mammograms between November 7, 2001 and September 9, 2003.   Nevertheless, while she did not undergo any mammograms during that time period, she still received medical treatment with respect to her history of breast

---

[12]Report, p. 150 of Sawhney's Exhibit A; also attached as part of Exhibit A to Plaintiff's Response to D/E #117; Letter, p. 422 of Sawhney's Exhibit A; also attached as part of Exhibit A to Plaintiff's Response to D/E #117; Report, pp. 482-483 of Sawhney's Exhibit A; Radiology Report, pp. 408-409 of Sawhney's Exhibit A; also attached as part of Exhibit A to Plaintiff's Response to D/E #117.

[13]Plaintiff's Deposition, p. 97.

cancer. On February 14, 2002, plaintiff visited Dr. Axelson for a appointment following up on plaintiff's previous breast cancer.[14] On May 22, 2003, Sawhney examined plaintiff after plaintiff complained of pain in both breasts. While Sawhney did not find any change in skin color or lymphadenopathy, she ordered a mammogram and chest x-ray.[15] On July 1, 2003, plaintiff was scheduled to undergo a mammogram, but the mammogram was scheduled for the wrong location and not completed.[16] On July 24, 2003, CMS authorized another diagnostic mammogram.[17] On July 25, 2003, plaintiff was examined by Dr. Nichols after plaintiff complained of pain in her right breast. Dr. Nichols did not find anything abnormal, but she did note that Sawhney had already ordered a mammogram.[18]

Therefore, while there was a period of time where plaintiff was not receiving mammograms, she continued to receive medical attention with respect to her breasts during that time and at least one mammogram was scheduled. Given that history of treatment, no genuine issue of material fact exists as to whether Sawhney disregarded any perceived risk of harm and she is entitled to summary judgment with respect to plaintiff's claim that Sawhney was deliberately indifferent to plaintiff's serious medical needs by failing to ensure that plaintiff received timely mammograms.

---

[14]Clinic Consultation, pp. 208-209 of Sawhney's Exhibit A; also attached as Appendix XIII to Plaintiff's Response to D/E #117 and as part of Exhibit B to plaintiff's response to D/E #128.

[15]Progress Notes, p. 59 of Sawhney's Exhibit A; Plaintiff's Deposition, p. 129.

[16]Plaintiff's Deposition, pp. 48-49.

[17]CMS Authorization Request, p. 28 of Sawhney's Exhibit A.

[18]Progress Notes, p. 55 of Sawhney's Exhibit A.

### 3. Medications

As discussed above, counts two, three, four and six of the second amended complaint are based upon defendants' alleged failure to provide plaintiff with certain prescribed medication in a timely manner.  With respect to that claim, Sawhney argues that she is entitled to summary judgment because a genuine issue of material fact does not exist as to either the objective component or the subjective component of a deliberate indifference claim; according to Sawhney, plaintiff did not have a serious medical need, Sawhney never subjectively perceived any risk of harm, and Sawhney never disregarded any risk of harm.


#### a. Objective Component

 As discussed above, where, as here, the plaintiff has non-obvious complaints of a serious need for medical care, the plaintiff "'must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment.'"  Johnson, 398 F.3d at 874, quoting Napier, 238 F.3d at 742.[19]

In this case, plaintiff's second amended complaint alleges that, during the time she was without her medications, plaintiff became very sick, she had difficulty breathing, her heart rate

---

[19]The Sixth Circuit has held that the denial of prescription medication can form the basis of a finding of deliberate indifference.  In Boretti v. Wiscomb, 930 F.2d 1150, 1154-55 (6th Cir. 1991), a prison nurse refused to give a prisoner his prescribed pain medication and the court noted that in Westlake v. Lucas, 537 F.2d 857, 860 (6th Cir. 1976), the court held that a prisoner who suffers pain needlessly when relief is readily available has a cause of action against those whose deliberate indifference is the cause of his suffering.  Boretti, 930 F.2d at 1154-1155.  In this case, unlike in Boretti and Westlake, plaintiff was not prescribed pain medication and there is no evidence suggesting that any delay in the refilling of her medications caused her pain.

decreased, her body temperature decreased, she experienced fatigue, she had problems with her memory and concentration, and she suffered from migraine headaches, depression, muscle pain and other problems. In plaintiff's response to Sawhney's motion for summary judgment, she asserts that she has suffered mental anguish as well as pain and suffering. However, despite plaintiff's extensive allegations regarding the effect of the delay in receiving medications, the only evidence she produces regarding an injury is the report generated from the whole body scan plaintiff underwent on January 22, 2007.[20] As discussed above, that scan revealed an "Abnormal increased concentration of radioactivity in the junction of body and manubrium sterni, and in the multiple (3) mid dorsal vertebrae, most likely due to metastasis" and "Abnormal uptake in the bilateral tibial shafts, most likely due to shin splints. Posterior arthopathy is less likely as a possibility. Clinical correlation of the plain radiographs of both tibias and fibulas is suggested for further evaluation." No other areas of abnormal changes in concentration of radioactivity were seen in plaintiff's skeleton.

Plaintiff has osteopenia[21] and at least some of her medications relate to that condition: on February 14, 2002, Dr. Axelson prescribed plaintiff Fosamax for osteopenia and osteoporosis prevention[22] and plaintiff's second amended complaint alleges that she had been prescribed Fosamax, Calcium, Vitamin D, and Vitamin E to treat her condition. Sawhney argues that the

---

[20]Report, attached as part of Appendix X to Plaintiff's Response to D/E #117 and as Exhibit H to Plaintiff's Response to D/E #128.

[21]Report, pp. 200-201 of Sawhney's Exhibit A.

[22]Clinic Consultation, pp. 208-209 of Sawhney's Exhibit A; also attached as Appendix XIII to Plaintiff's Response to D/E #117 and as part of Exhibit B to plaintiff's response to D/E #128.

report relied on by plaintiff merely reflects the natural progression of plaintiff's condition and not damage caused by any delay in refilling plaintiff's condition, but she offers no support for that assertion. Sawhney also argues that plaintiff conceded at her deposition that the deterioration of plaintiff's bones was caused by chemotherapy and not a delay in receiving her medications, but that argument misconstrues plaintiff's deposition testimony. Instead of conceding that any deterioration in her bones was caused by chemotherapy, plaintiff merely testified that she does not know what caused the deterioration as she is not a doctor.[23]

When deciding a motion for summary judgment, the Court must view the evidence and draw all reasonable inferences in favor of the non-movant. See Matsushita, 475 U.S. at 587. In this case, given plaintiff's osteopenia, the reason some of her medications were prescribed, and the report demonstrating a deterioration in plaintiff's bones, a genuine issue of material fact exists as to whether plaintiff had a serious medical need with respect to her claim that the delay in refilling her medications constituted deliberate indifference.[24]

**b. Subjective Component**

With respect to the subjective component of plaintiff's claim regarding the refilling of medications, Sawhney first argues that no genuine issue of material fact exists with respect to whether she perceived any risk of harm to plaintiff because there is no evidence that she knew of

---

[23]Plaintiff's Deposition, pp. 125-126.

[24]While plaintiff does not make any argument regarding her thyroid medications in her response to Sawhney's motion to dismiss, plaintiff argues in her response to Bryant and Rawlins' motion to dismiss that the delay in receiving her thyroid medications resulted in plaintiff having high cholesterol. However, as discussed below, plaintiff's argument is not supported by any evidence and it fails to demonstrate that a genuine issue of material fact exists on this issue.

the delay in the medications being refilled. However, as detailed above, plaintiff submitted a number of order forms regarding the refilling of her medications.[25] Sawhney argues that there is no proof that the requests went to her or that she received those forms, but when plaintiff submitted a medical kite regarding her medications, she received a response stating that doctors, such as Sawhney, do not process medical kites and that plaintiff should submit the proper forms[26], which suggests that when plaintiff previously submitted the proper forms they should have been received by Sawhney. Moreover, plaintiff testified at her deposition that she spoke with Sawhney on several occasions and Sawhney indicated that she had ordered the medications and she did not why plaintiff had not received her them.[27] Given the evidence demonstrating that plaintiff submitted forms regarding the delay in receiving her medications as well as her conversations with Sawhney, a genuine issue of material fact exists as to whether Sawhney perceived any risk of harm to plaintiff.[28]

Sawhney also argues that, given the evidence regarding her medical treatment of plaintiff, no genuine issue of material fact exists with respect to whether she disregarded any risk of harm to plaintiff. As noted above, plaintiff's deposition testimony provides that she spoke with Sawhney on several occasions and Sawhney indicated that she had ordered plaintiff's

---

[25]Plaintiff's numerous requests for medication refills are attached as Exhibits 6, 8, and 9 of Plaintiff's Deposition.

[26]Health Care Request and Response, attached as Exhibit 7 to Plaintiff's Deposition.

[27]Plaintiff's Deposition, pp. 111-117, 119-123.

[28]Plaintiff also argues that several of her Resident Unit Officers spoke with Sawhney over the phone regarding plaintiff's medications, but she submits no evidence that such conversations occurred.

medications and she did not know why plaintiff had not received her medications.[29]  Moreover,

plaintiff also testified that Sawhney performed blood work in order to check on plaintiff's thyroid

medications.[30]  Plaintiff does not submit any evidence that Sawhney disregarded a risk of harm

to plaintiff and instead appears to merely argue that, because Sawhney knew of the delay and her

inaction constituted deliberate indifference.  However, deliberate indifference is characterized by

obduracy and wantonness, not inadvertence or good faith error.  <u>Gibson</u>, 963 F.2d at 853.  Given

the evidence that Sawhney ordered plaintiff's medications, did not know why there was a delay

and performed blood work with respect to plaintiff's thyroid medications, there is no genuine

issue of material fact as to the subjective component of plaintiff's claim regarding her

medications and Sawhney is therefore entitled to summary judgment on that claim.

### 4. Specialists

In count seven, plaintiff alleges that she was improperly denied access to her oncologist,

endocrinologist, and gynecologist.  With respect to that claim, Sawhney argues that she is

entitled to summary judgment because no genuine issue of material fact exists as to either the

objective component or the subjective component of a deliberate indifference claim; according to

Sawhney, plaintiff did not have a serious medical need and Sawhney did not subjectively

perceive any risk of harm and then disregard it.

### a. Dr. Axelson

---

[29]Plaintiff's Deposition, pp. 111-117, 119-123.

[30]Plaintiff's Deposition, p. 142.

On February 14, 2002, Dr. Axelson examined plaintiff and, after noting that plaintiff was complaining of back pain and that she had an abnormal bone scan, Dr. Axelson recommended both that plaintiff undergo a bone densitometry study along with thoracic films and that plaintiff start taking the medication Fosamax for osteopenia and osteoporosis prevention.[31] Moreover, both plaintiff's progress notes and a specialty consult report reflect that plaintiff was to return to the clinic at the Duane Waters Hospital for a follow-up visit with Dr. Axelson in three months.[32] While plaintiff was later diagnosed with osteopenia, it is clear from the record that she never returned to see Dr. Axelson.

While plaintiff never returned to see Dr. Axelson, Sawhney first argues that plaintiff did not suffer any injury as a result and, therefore, Sawhney is entitled to summary judgment. As discussed above, where, as here, the plaintiff has non-obvious complaints of a serious need for medical care, the plaintiff "'must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment.'" Johnson, 398 F.3d at 874, quoting Napier, 238 F.3d at 742. In this case, Dr. Axelson treated plaintiff for osteopenia and osteoporosis prevention during the February 14, 2002 examination and he expressly found that plaintiff should see him in three months. While plaintiff never saw Dr. Axelson again, she was later

[31]Clinic Consultation, pp. 208-209 of Sawhney's Exhibit A; also attached as Appendix XIII to Plaintiff's Response to D/E #117 and as part of Exhibit B to plaintiff's response to D/E #128.

[32]Progress Notes and Specialty Consult Report, pp. 83, 142 of Sawhney's Exhibit A; also attached as part of Appendix VI to Plaintiff's Response to D/E #117 and as part of Exhibit B to Plaintiff's Response to D/E #128.

diagnosed with osteopenia and a whole body scan performed on January 22, 2007[33] revealed a deterioration in plaintiff's bones. Sawhney again argues that the report relied on by plaintiff merely reflects the natural progression of plaintiff's conditions and not damage caused by her inability to see Dr. Axelson, but she offers no support for that assertion. Sawhney also argues that plaintiff conceded at her deposition that the deterioration of plaintiff's bones was caused by chemotherapy and not a delay in receiving her medications, but that argument misconstrues plaintiff's testimony. Instead of conceding that any deterioration in her bones was caused by chemotherapy, plaintiff merely testified that she does not know what caused the deterioration as she is not a doctor.[34]

When deciding a motion for summary judgment, the Court must view the evidence and draw all reasonable inferences in favor of the non-movant. See Matsushita, 475 U.S. at 587. In this case, given plaintiff's osteopenia, Dr. Axelson's treatment of that condition and his request to examine plaintiff again, and the report demonstrating a deterioration in plaintiff's bones, a genuine issue of material fact exists as to whether plaintiff had a serious medical need with respect to her claim that the denial of access to Dr. Axelson constituted deliberate indifference.

Sawhney also argues that she is entitled to summary judgment because, with respect to any referral to Dr. Axelson, she did not subjectively perceive and then disregard any risk of harm. As discussed above, Dr. Axelson treated plaintiff, in part, for osteopenia and osteoporosis prevention during the February 14, 2002 examination and plaintiff was later diagnosed with

---

[33]Report, attached as part of Appendix X to Plaintiff's Response to D/E #117 and as Exhibit H to Plaintiff's Response to D/E #128.

[34]Plaintiff's Deposition, pp. 125-126.

osteopenia.  While plaintiff never returned to see Dr. Axelson, plaintiff's medical records reflect

that plaintiff was receiving medication for her osteopenia[35] and the progress notes regarding

plaintiff's treatment suggest that plaintiff was receiving other care.  On July 8, 2003, plaintiff

demanded a bone density test, among other things, but Sawhney found there was no need for

repeat tests and that she had seen plaintiff around the prison and plaintiff did not appear to have

any pain.[36]  On April 20, 2005, plaintiff was informed that her osteoporosis was being treated by

her medical service provider and not by her oncologist.[37]  On August 31, 2005, Dr. Nichols

wrote that he had reviewed plaintiff's records and, while plaintiff continued to have complaints

and concerns, she is receiving the appropriate medical care and did not need to see any outside

specialists.[38]

Moreover, in reviewing plaintiff's requests to see Dr. Axelson, Sawhney always had

legitimate reasons for denying a referral.  On June 9, 2003, Sawhney reviewed plaintiff's file and

found there was no 409 form in the file for a return visit with Dr. Axelson.[39]  On May 11, 2004,

Sawhney again noted that there was no documentation providing for a visit to an oncologist and

that plaintiff's last visit to an oncologist had been in February of 2002.[40]  On September 27, 2004

---

[35]See Plaintiff's requests for medication refills, attached as Exhibits 6, 8, and 9 of Plaintiff's Deposition.

[36]Progress Notes, p. 56 of Sawhney's Exhibit A.

[37]Progress Notes, p. 357 of Sawhney's Exhibit A.

[38]Progress Notes, p. 347 of Sawhney's Exhibit A.

[39]Progress Notes, p. 58 of Sawhney's Exhibit A.

[40]Progress Notes, p. 45 of Sawhney's Exhibit A.

and October 7, 2004, Sawhney specifically discussed with Dr. Prough whether plaintiff needed to see Dr. Axelson.  The conclusion reached after those discussions was that plaintiff did not need to see Dr. Axelson again, though Dr. Prough did write that, given plaintiff's persistent concerns, plaintiff may benefit from a visit to Dr. Axelson and hearing directly from him that she was fine.[41]

Where the prisoner has received some medical attention and the dispute is over the adequacy of the treatment, courts are reluctant to second guess medical judgments, Westlake, 537 F.2d at 860 n. 5.  In this case, there is evidence demonstrating that plaintiff received treatment for her osteopenia and Sawhney, Dr. Prough and Dr. Nichols all concurred in the assessment that plaintiff did not need to see Dr. Axelson again.  While plaintiff may have wished to have a return visit, Sawhney has demonstrated that no genuine issue of material fact exists as to whether she disregarded a serious medical need of plaintiff's by not ensuring that plaintiff had that visit and Sawhney is therefore entitled to summary judgment on plaintiff's claim regarding the denial of access to Dr. Axelson.

**b. Dr. Qutob**

On November 26, 2002, Dr. Casey wrote that, because plaintiff has a history of thyroid disease, he would arrange a consultation with Dr. Qutob, an endocrinologist.[42]  Plaintiff never had a consultation with Dr. Qutob.

---

[41]Progress Notes, pp. 37, 39 of Sawhney's Exhibit A; Letter, pp. 147-148 of Sawhney's Exhibit A.

[42]Clinic Consultation, p. 175 of Sawhney's Exhibit A; also attached as part of Appendix XI to Plaintiff's Response to D/E #117 and as part of Exhibit C to Plaintiff's Response to D/E #128.

In her response to Sawhney's motion for summary judgment, plaintiff does not provide any evidence of an injury resulting from her inability to see Dr. Qutob.[43]  Consequently, Sawhney is entitled to summary judgment on that portion of plaintiff's claim because no genuine issue of material facts exists as to whether plaintiff had a serious medical need.  <u>Johnson</u>, 398 F.3d at 874, quoting <u>Napier</u>, 238 F.3d at 742.  Moreover, there does not appear to be any genuine issue of material fact as to whether Sawhney was deliberately indifferent to any serious medical need relating to plaintiff's thyroid given plaintiff's testimony that Sawhney performed blood work in order to check on plaintiff's thyroid medications[44] and the findings of Dr. Nichols on August 31, 2005 that Dr. Nichols had reviewed plaintiff's records and, while plaintiff continued to have complaints and concerns, she is receiving the appropriate medical care and does not need to see any outside specialists.[45]

**c. Gynecologist**

In her second amended complaint, plaintiff asserts that Sawhney denied plaintiff access to a gynecologist capable of evaluation plaintiff's need for treatment.[46]  However, plaintiff's second amended complaint is somewhat confusing on this issue and it is unclear exactly what medical condition she claims to have that a gynecologist would address.  Moreover, both

---

[43]As discussed below, in response to a similar argument in made by defendant Bryant in D/E #128, plaintiff argues that her cholesterol rose as a result the denial of a referral to Dr. Qutob.  That argument is ineffective because plaintiff has no evidence supporting his argument..

[44]Plaintiff's Deposition, p. 142.

[45]Progress Notes, p. 347 of Sawhney's Exhibit A.

[46]Second Amended Complaint, pp. 24-27.

Sawhney's motion for summary judgment and plaintiff's response to that motion for summary judgment are silent on this issue.

While Sawhney's motion for summary judgment does not specifically address plaintiff's claim regarding a referral to a gynecologist, Sawhney has met her initial burden of demonstrating the absence of a genuine issue of material fact. <u>Matsushita</u>, 475 U.S. at 587; Fed. R. Civ. P. 56(e). That initial "burden on the moving party may be discharged by 'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case," <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554 (1986) and Sawhney does point out in her motion that plaintiff's complaint fails to demonstrate any serious medical needs with respect to all of plaintiff's claims.

As Sawhney has met her initial burden of demonstrating the absence of a genuine issue of material fact, plaintiff must only come forward with specific facts showing that there is a genuine issue for trial. <u>Matsushita</u>, 475 U.S. at 587; Fed. R. Civ. P. 56(e). In this case, plaintiff has failed to come forward with any specific facts showing that she had a serious medical need relating to the alleged denial of access to a gynecologist and, consequently, Sawhney is entitled to summary judgment on that claim.

## B. Bryant

As conceded by plaintiff, the remaining issue with respect to defendant Bryant is whether Bryant was deliberately indifferent to plaintiff's medical needs by failing to schedule appointments for plaintiff with Dr. Axelson and Dr. Qutob.[47] Bryant argues that she is entitled to

---

[47]Plaintiff's Brief in Response to Bryant and Rawlins' Motion for Summary Judgment, p. 2.

summary judgment because she was not personally involved in the alleged constitutional violations during 2002 and because plaintiff suffered no injury from the alleged constitutional violations.

### 1. Personal Involvement

To succeed in a claim under § 1983, a plaintiff must show personal involvement by the defendant in the constitutional violation; at a minimum, the defendants must have encouraged or condoned the illegal actions of the other defendants. <u>Salehpour v Univ. of Tenn.</u>, 159 F.3d 199, 206-207 (6th Cir. 1998); <u>Copeland v. Machulis</u>, 57 F.3d 476, 481 (6th Cir. 1995) (per curiam).

Bryant started working as a nurse at SCF in July 2002 and her job is to coordinate "off-site" specialty services between the medical service providers and CMS.[48]  In this case, the first communication directed to Bryant from plaintiff occurred on March 3, 2003.  On that date, plaintiff sent a medical kite, addressed to Bryant, regarding Dr. Axelson's request to see plaintiff within three months of plaintiff's February 14, 2002 examination and Dr. Casey's statement that he would arrange for plaintiff to see an endocrinologist.[49]  Moreover, Bryant stated in her affidavit that she cannot schedule any appointments with specialty service providers without authorization from CMS and there was no such authorization in 2002.[50]  Both plaintiff and inmate Trapani stated that a form providing for a return visit to Dr. Axelson existed in plaintiff's

---

[48]Affidavit of Juanita Bryant, ¶¶ 1, 3, attached as Exhibit A to Bryant and Rawlins' Motion for Summary Judgment.

[49]Medical Kite, March 4, 2003, attached as Exhibit 1 to Plaintiff's Deposition.

[50]Affidavit of Juanita Bryant, ¶¶ 6-7, 9 attached as Exhibit A to Bryant and Rawlins' Motion for Summary Judgment.

medical file, but plaintiff could not produce any such form and plaintiff's progress reports provide that no such forms were in the file.[51]

Given the above evidence, no genuine issue of material fact exists with respect to whether Bryant was personally involved in the alleged constitutional violation that occurred during 2002 and Bryant is entitled to summary judgment on that portion of plaintiff's claim. Bryant did not start working at SCF until July of that year and there is no evidence suggesting that plaintiff or any doctor requested a referral from Bryant during the rest of that year.

**2. Injury**

Bryant also argues that she is entitled to summary judgment on the rest of plaintiff's claim because plaintiff did not suffer any injury as a result of the Bryant's alleged constitutional violations. Where, as here, the plaintiff has non-obvious complaints of a serious need for medical care, the plaintiff "'must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment.'" Johnson, 398 F.3d at 874, quoting Napier, 238 F.3d at 742.

**a. Dr. Axelson**

In this case, as discussed above with respect to defendant Sawhney's similar argument, plaintiff's osteopenia condition, Dr. Axelson's treatment of that condition, Dr. Axelson's specific request to examine plaintiff again, and the report demonstrating a deterioration in plaintiff's bones demonstrate that a genuine issue of material fact exists as to whether plaintiff had a

---

[51]Affidavit of Donna Trapani, attached as part of Attachment A to Plaintiff's Response to D/E #117; Plaintiff's Deposition, pp. 53-54; Progress Notes, p. 58 of Sawhney's Exhibit A.

serious medical need with respect to her claim that the denial of access to Dr. Axelson constituted deliberate indifference.

**b. Dr. Qutob**

With respect her claim regarding the referral to Dr. Qutob, plaintiff has failed to place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment and Bryant is entitled to summary judgment on that portion of plaintiff's claim. Johnson, 398 F.3d at 874, quoting Napier, 238 F.3d at 742. As discussed above, Dr. Casey wrote on November 26, 2002 that, because plaintiff has a history of thyroid disease, he would arrange a consultation with Dr. Qutob, an endocrinologist[52] but plaintiff never had a consultation with Dr. Qutob.

In her response to defendants' motion for summary judgment, plaintiff asserts that she has suffered high cholesterol as a result of Bryant's denial of access to Dr. Qutob and plaintiff also provides a March 3, 2005 report from the Garcia Laboratory indicating that plaintiff's cholesterol was 314 mg/dl. According to that report, "high" cholesterol is greater than or equal to 240 mg/dl.[53] Plaintiff does not, however, provide any support for her assertion that the denial of access to Dr. Qutob resulted in her high cholesterol. Given the lack of evidence supporting plaintiff's claim, she has failed to demonstrate that a genuine issue of material fact exists as to

---

[52]Clinic Consultation, p. 175 of Sawhney's Exhibit A; also attached as part of Appendix XI to Plaintiff's Response to D/E #117 and as part of Exhibit C to Plaintiff's Response to D/E #128.

[53]Garcia Laboratory Report, March 3, 2005, attached as Appendix V to Plaintiff's Response to D/E #117.

whether plaintiff had a serious medical need in relation to the referral to Dr. Qutob and Bryant is entitled to summary judgment on that claim.

## C. Rawlins

As conceded by plaintiff, the only claim she has remaining against defendant Rawlins is whether Rawlins was deliberately indifferent to plaintiff's medical needs by failing to timely refill plaintiff's medications.[54]  With respect to that claim, Rawlins argues that she is entitled to summary judgment because no genuine issue of material fact exists as to either the objective component or the subjective component of a deliberate indifference claim; according to Rawlins, plaintiff cannot show that plaintiff had a serious medical need or that her medications were not refilled in a timely manner.

### 1. Objective Component

### a. Osteopenia Medications

As discussed above, with respect to Sawhney's similar argument, plaintiff's osteopenia condition, the reason some of her medications were prescribed, and the report showing a deterioration in plaintiff's bones demonstrate that a genuine issue of material fact exists as to whether plaintiff had a serious medical need with respect to her claim that the delay in refilling her osteopenia medications constituted deliberate indifference.

### b. Thyroid Medications

With respect to her thyroid medications, plaintiff argues that her serious medical need is adequately demonstrated through the report of her high cholesterol level.  However, as discussed

---

[54]Plaintiff's Deposition, p. 88.

above, plaintiff fails to provide any evidence demonstrating a connection between any delay in receiving her thyroid medication and her alleged injury.  Consequently, there no genuine issue of material fact in dispute as to the objective component of plaintiff's deliberate indifference claim and Rawlins is entitled to summary judgment on the portion of plaintiff's claim relating to plaintiff's thyroid medications..

## 2. Subjective Component

Rawlins argues that no genuine issue of material fact exist with respect to the subjective component of plaintiff's deliberate indifference claim against her because plaintiff's sole evidence on this issue are the medication refill request forms she filled out.  According to Rawlins, those forms have no probative value because  plaintiff would have had to have filled them out to have her medications timely filled.[55]

Plaintiff  submitted requests for refills of her medications on January 24, 2003, February 2, 2003, February 7, 2003, February 8, 2003, May 16, 2003, June 5, 2003, June 12, 2003, June 13, 2003, June 18, 2003, June 21, 2003, and June 28, 2003.[56]  The sheer number of such requests, as well as their close proximity to each other suggests that plaintiff was requesting medications that had not been timely refilled, rather than merely requesting a timely refill as suggested by Rawlins.  Moreover, plaintiff indicated on a number of those request forms that she was without medications at the time the request was filed.  Given the timing, volume and content of plaintiff's

---

[55]Plaintiff's Deposition, p. 70.

[56]Plaintiff's numerous requests for medication refills are attached as Exhibits 6, 8, and 9 of Plaintiff's Deposition.

requests for refills of her medications, she has demonstrated that a genuine issue of material fact exists as to whether plaintiff's medications were timely refilled.

**V. Conclusion**

For the reasons discussed above, the court recommends that defendant Sawhney's motion for summary judgment be granted in part and that only the claim against her in count one of plaintiff's second amended complaint be allowed to proceed. This Court also recommends that defendants' Bryant and Rawlins' motion for summary judgment be granted in part and that only plaintiff's claims against them relating to her treatment for osteopenia be allowed to proceed.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. Thomas v. Arn, 474 U.S. 140 (1985); Howard v. Secretary of HHS, 932 F.2d 505, 508 (6th Cir. 1991); United States v. Walters, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. Willis v. Secretary of HHS, 931 F.2d 390, 401 (6th Cir. 1991); Smith v. Detroit Fed'n of Teachers Local 231, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length

unless, by motion and order, the page limit is extended by the court.  The response shall address

each issue contained within the objections specifically and in the same order raised.

S/Virginia M. Morgan
Virginia M. Morgan
United States Magistrate Judge

Dated:  August 20, 2008

---

## PROOF OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and plaintiff via the Court's ECF System and/or U. S. Mail on August 20, 2008.

s/Jane Johnson
Case Manager to
Magistrate Judge Virginia M. Morgan