UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMIRA SALEM,

               Plaintiff,                         CIVIL ACTION NO. 04-72250

      v.                              DISTRICT JUDGE JOHN CORBETT O'MEARA

MS. YUKINS, MS DAVIS,          MAGISTRATE JUDGE VIRGINIA M. MORGAN
DR. SAWHNEY, DR. NICHOLS,
MS. EPP, MR. ARMSTRONG,
MS. JENKINSON, MS. ELLEN,
MS. HYNES, MS. BRYANT,
MR. HONOR, MS. NICHOLS,
MS. DOSANJH, MS. RAWLINS,
MS. RAGUCHAS, and MS. DAVIS,[1]

               Defendants.
_____/

**REPORT AND RECOMMENDATION
TO GRANT DR. NICHOLS' MOTION
FOR SUMMARY JUDGMENT (D/E #189)**

**I.  Introduction**

      Plaintiff, an inmate at the Robert Scott Correctional Facility (SCF) in Plymouth,

Michigan, filed a *pro se* civil rights action under 42 U.S.C. § 1983 against sixteen Michigan

Department of Corrections (MDOC) officials, alleging that they denied her necessary medical

care in violation of the Eighth Amendment.  The matter comes before the court on defendant Dr.

_____

      [1]On February 22. 2005, the Honorable John Corbett O'Meara issued an order dismissing
all of the defendants except Sawhney, Bryant and Rawlins (D/E #59).  Dr. Nichols was later
reinstated as a defendant (D/E #106).  Sawhney, Bryant, Rawlins and Dr. Nichols are the only
defendants remaining in this action.

Ronald Nichols' Motion for Summary Judgment (D/E #189).  For the reasons discussed below, this court recommends that Dr. Nichol's motion for summary judgment be **GRANTED**.

## II.  Background

### A. Factual Background

Plaintiff has been incarcerated in prison since August 8, 1997.  (Plaintiff's Deposition, p. 19)[2]  She was housed at SCF from August 8, 1997 through August 2, 2005.  On August 2, 2005, plaintiff was transferred to the Huron Valley Women's Facility (WHV), where she is currently incarcerated.  (Plaintiff's Deposition, pp. 19-20)

Plaintiff has a history of breast cancer.  In 1994, plaintiff was diagnosed with breast cancer and had lumpectomy surgery.  In 1995, plaintiff underwent chemotherapy and radiation.  Since that time, plaintiff's cancer has been in remission.  (Plaintiff's Deposition, p. 97)

Plaintiff underwent mammograms on December 3, 1998 and March 8, 2000.  The findings of both of those mammograms were benign.  (Reports, attached as part of Appendix IX to D/E #126)[3]

On October 8, 2001, plaintiff was examined by Dr. John Axelson, an oncologist, and Dr. Axelson found no evidence of anything wrong with plaintiff.  Dr. Axelson did, however, order an MRI of plaintiff's thoracic spine and a total body scan.  (Clinic Consultation, attached as part

---

[2]The transcript of plaintiff's deposition is attached as Exhibit B to Dr. Nichol's Motion for Summary Judgment.

[3]Rather than reattaching a number of medical records to her current response, plaintiff instead incorporated by reference evidence previously submitted to the court in support of her prior responses to motions for summary judgment..

of Exhibit A to D/E #126)  The MRI was normal and it displayed no evidence of metastasis. (MRI Report, attached as part of Exhibit A to D/E #126)

On November 1, 2001, plaintiff underwent the bone scan ordered by Dr. Axelson.  She was subsequently examined by Dr. Malcolm S. Trimble.  According to Dr. Trimble, the bone scan revealed an increased uptake at T8, which was "concerning for metastatic disease."  The bone scan also showed a solitary lesion in plaintiff's mid-thoracic spine.  Dr. Trimble ordered an MRI of plaintiff's T-spine.  (Clinic Consultation, pp. 208 and 221 of Plaintiff's Medical Records)[4]  A December 19, 2001 MRI revealed no bony abnormalities in plaintiff's thoracic spine or spinal cord.  (MRI Report, p. 208 of Plaintiff's Medical Records)

On November 7, 2001, plaintiff had another mammogram.  That mammogram revealed plaintiff's previous lumpectomy and radiation, but no suspicious calcifications or significant abnormalities.  The assessment was benign, pending comparison with previous mammograms. (Mammography Report, p. 227 of Plaintiff's Medical Records)  On December 19, 2001, that mammogram was compared to previous mammograms and the final assessment was again benign.  (Mammography Report, attached as part of Appendix VIII to D/E #126)

On February 14, 2002, plaintiff visited Dr. Axelson for a appointment following up on plaintiff's previous breast cancer.  Upon examination, Dr. Axelson found a "right supraclavicular lymph node" that he believed was most likely benign.  However, Dr. Axelson did refer plaintiff to Dr. Gregory Casey for a lymph node biopsy in order to be sure the lymph node was benign.

---

[4]The page numbers of plaintiff's medical records refer to the Bates-stamped page numbers.  The medical records themselves have been exchanged between the parties and are found in a number of places in the record,  For the sake of convenience, this court will only refer to the Bates-stamped page numbers when possible.

Additionally, after noting that plaintiff was complaining of back pain and that she had an abnormal bone scan,  Dr. Axelson recommended both that plaintiff undergo a bone densitometry study along with thoracic films and that plaintiff start taking the medication Fosamax for osteopenia and osteoporosis prevention.  (Clinic Consultation, pp. 208-209 of Plaintiff's Medical Records)

Both plaintiff's progress notes and a specialty consult report reflect that plaintiff was to return to the clinic at the Duane Waters Hospital for a follow-up visit with Dr. Axelson in three months.  (pp. 83, 142 of Plaintiff's Medical Records)  According to her affidavit, inmate Donna Trapani heard Dr. Axelson advise plaintiff of plaintiff's treatment and she saw Dr. Axelson hand a transportation officer a 409 form regarding plaintiff's return visit.  (Affidavit of Donna Trapani, attached as part of Attachment A to D/E #126)  Although plaintiff could not produce any such form, she also recalls seeing a 409 form in her medical file. (Plaintiff's Deposition, pp. 53-54)

An April 1, 2002 bone density study showed that plaintiff had osteopenia.  (Report, pp. 200-201 of Plaintiff's Medical Records)

On July 9, 2002, Dr. Casey conducted a needle aspiration biopsy on the area of supraclavicular adenopathy.  (Clinic Consultation, pp.188-189 of Plaintiff's Medical Records) That biopsy did not identify any tumor cells and the tissue came back as showing normal lymphoid appearing tissue.  (Progress Notes and Clinic Consultations, pp. 72, 175, and 182 of Plaintiff's Medical Records)

On November 12, 2002, Dr. Casey saw plaintiff by "telemed" because, despite the benign findings of plaintiff's tests, plaintiff had stated that the area of her neck where the lymphoid was

had increased in size since Dr. Casey last saw her.  Dr. Casey recommended that plaintiff be sent to see him in two weeks, (Clinic Consultation, p. 182 of Plaintiff's Medical Records)

On November 26, 2002, Dr. Casey examined plaintiff at the clinic.  Dr. Casey found that plaintiff's lymph nodes at the base of the right side of her neck had increased and, therefore, he recommended that plaintiff taken in for a formal excisional biopsy of at least one of the lymph nodes.  Dr. Casey also stated that, because plaintiff has a history of thyroid disease, he would arrange a consultation with Dr. Qutob, an endocrinologist.  (Clinic Consultation, p. 175 of Plaintiff's Medical Records)

CMS approved the biopsy recommended by Dr. Casey (CMS Authorization Request and Response, pp. 30-31, 66 of Plaintiff's Medical Records) and, on January 10, 2003, Dr. Casey performed a "Supraclavicular exploration of the middle triangle of the neck with no identification of lymphadenopathy."  (Operative Report, p. 159 of Plaintiff's Medical Records) That operation did not reveal any evidence of any gross lymphadenopathy.  (Operative Report, pp. 159-160 of Plaintiff's Medical Records)

On March 3, 2003, plaintiff sent a medical kite, addressed to Bryant, regarding Dr. Axelson's request to see plaintiff within three months of plaintiff's February 14, 2002 examination and Dr. Casey's statement that he would arrange for plaintiff to see an endocrinologist.  (Medical Kite, March 4, 2003, attached as Exhibit 1 to Plaintiff's Deposition)

On March 18, 2003, plaintiff met with Sawhney.  According to MDOC progress notes, plaintiff wanted to see her oncologist and the endocrinologist recommended by Dr. Casey. Sawhney wrote that plaintiff was very demanding and that he would review plaintiff progress

notes and speak with the off site coordinator.  (Progress Notes, p. 64 of Plaintiff's Medical Records)

On May 22, 2003, plaintiff again met with Sawhney to complain of pain in both breasts. While Sawhney did not find any change in skin color or lymphadenopathy, she ordered a mammogram and chest x-ray.  (Progress Notes, p. 59 of Plaintiff's Medical Records; Plaintiff's Deposition, p. 129)  The chest x-ray was performed that day and it revealed normal findings and no active pulmonary disease.  (Radiology Request and Report, p. 124 of Plaintiff's Medical Records)

On June 9, 2003, the MDOC progress notes for plaintiff provided that plaintiff kept sending in kites stating that she needed to see Dr. Axelson and Dr. Casey.  The progress notes also stated that Sawhney had reviewed plaintiff's file and found there was no 409 form for a return visit with Dr. Axelson or Dr. Casey.  (Progress Notes, p. 58 of Plaintiff's Medical Records)

According to plaintiff, she was scheduled to undergo a mammogram on July 1, 2003, but the mammogram was scheduled for the wrong location and, therefore, not done.  (Plaintiff's Deposition, pp. 48-49)

On July 8, 2003, plaintiff visited with Sawhney and, according to Sawhney's notes, demanded a fan, a chest x-ray report and a bone density test.  Sawhney also noted that she reviewed plaintiff's file and there was no need for repeat tests.  Sawhney further noted that she had seen plaintiff around the prison and plaintiff did not appear to have any pain.  (Progress Notes, p. 56 of Plaintiff's Medical Records)

- 6 -

On July 24, 2003, CMS authorized a diagnostic mammogram.  (CMS Authorization Request, p. 28 of Plaintiff's Medical Records)  On July 25, 2003, plaintiff was examined by Nurse Nichols.  While plaintiff complained of pain in her right breast, Nurse Nichols did not find anything abnormal.  Nurse Nichols did note that Sawhney had already ordered a mammogram. (Progress Notes, p. 55 of Plaintiff's Medical Records)

On August 8, 2003, plaintiff again visited with Sawhney and complained that she needed to see Dr. Axelson and have a bone density scan.  (Progress Notes, p. 54 of Plaintiff's Medical Records)

On August 19, 2003, plaintiff sent a Health Care Request, addressed to Bryant, requesting that a mammogram be scheduled.  In a response dated August 22, 2003, an unidentified person wrote that Sawhney had already requested that a mammogram be performed, but because it had to be performed off-site, CMS approval was needed.  The response also stated that Bryant would check on the "hold-up" in getting CMS approval.  (Health Care Request and Response, attached as Exhibit 2 to Plaintiff's Deposition)

On September 8, 2003, plaintiff sent another Health Care Request addressed to Bryant. In that request, plaintiff stated that the pain in her breast had increased since her previous request and she needed a mammogram.  (Health Care Request, attached as Exhibit 3 to Plaintiff's Deposition)

On September 9, 2003, plaintiff underwent a bilateral diagnostic mammogram.  The radiology report from that date found the presence of a few benign-appearing calcifications. There were no suspicious cluster of microcalcifications.  (Radiology Report, p. 156 of Plaintiff's Medical Records)  That report was also compared with previous mammograms and it was

determined that the calcifications were stable.  It was also recommended that a follow-up

mammogram be made in one year.  (Radiology Report, p. 157 of Plaintiff's Medical Records)

On January 21, 2004, a request was made by Nurse Nichols, for a pelvic ultrasound and

that request was later approved.  (CMS Pended or Denied Form, p. 20 of Plaintiff's Medical

Records; CMS Authorization Requests, p. 24 of Plaintiff's Medical Records)  However, after

seeing plaintiff on February 24, 2004, Dr. Nichols stated plaintiff did not need a pelvic

ultrasound. (CMS Pended or Denied Form, p. 20 of Plaintiff's Medical Records; Progress Notes,

p. 49 of Plaintiff's Medical Records).  According to Dr. Nichols, plaintiff probably had

adhesions from a previous surgery.  (Progress Notes, p. 49 of Plaintiff's Medical Records)  Dr

Nichols also stated that he had answered plaintiff's questions.  (Progress Notes, p. 49 of

Plaintiff's Medical Records)

On April 27, 2004, plaintiff visited Sawhney and complained about an enlarged lymph

node on the right side of her neck, a sore throat and pain in her hip.  Sawhney found a dime sized

lump, prescribed medication and ordered an x-ray of plaintiff's hip.  (Progress Notes, p. 47 of

Plaintiff's Medical Records; Plaintiff's Deposition, p. 151)

On May 1, 2004, CMS approved a needle biopsy of the right side of plaintiff's neck.

(CMS Authorization Request, p. 18 of Plaintiff's Medical Records)

On May 11, 2004, plaintiff again visited Sawhney stating that she needed to see an

oncologist and complaining about the lump on her neck.  In response, Sawhney noted that there

was no documentation providing for a visit to an oncologist and that plaintiff's last visit to an

oncologist had been in February of 2002.  On exam, Sawhney found a nickel-sized lump above

- 8 -

the right clavicle bone which was soft and movable.  Sawhney also noted that she would refer plaintiff for a biopsy.  (Progress Notes, p. 45 of Plaintiff's Medical Records)

On June 6, 2004, CMS again approved a biopsy of the right side of plaintiff's neck. (CMS Authorization Request, p. 14 of Plaintiff's Medical Records)  The right cervical neck lymph node biopsy was performed on July 14, 2004 and it showed no evidence of lymphoma or other malignancy.  (Progress Notes and Surgical Pathology Report, pp. 40 and 113 of Plaintiff's Medical Records)

On June 24, 2004, plaintiff sent a memo, addressed to Ms. Butler, plaintiff's health care manager, requesting a meeting to discuss plaintiff's ongoing health concerns.  On July 15, 2004, Butler requested a statement of plaintiff's concerns so that Butler could be aware of plaintiff's issues prior to meeting with plaintiff.  (Memo and Response, attached as Exhibit 5 to Plaintiff's Deposition)

On July 19, 2004, Nurse Nichols examined plaintiff after plaintiff complained of bilateral nipple discharge, but plaintiff was unable to describe the frequency or onset of the claimed discharge.  Nurse Nichols found no discharge from the right nipple and only pinhead size discharge from the left.  Nurse Nichols told plaintiff she would request a referral for plaintiff. (Progress Notes, p. 42 of Plaintiff's Medical Records)  A request for a referral to evaluate the discharge was made that same day and, on July 21, 2004, CMS approved a diagnostic mammogram.  (CMS Authorization Request, pp. 8, 11 of Plaintiff's Medical Records)  That mammogram was conducted on August 4, 2004 and it revealed no radiographic evidence of malignancy in the left breast.  (Report, p. 150 of Plaintiff's Medical Records)

On August 19, 2004, plaintiff met with a Health Unit Manager to discuss her numerous concerns, including plaintiff's concerns regarding her visits to specialists and her medications. The Health Unit Manager said she would speak to Sawhney at the next possible date.  (Progress Notes, p. 39 of Plaintiff's Medical Records)

On August 20, 2004, a request was made for a consult with Dr. Axelson (CMS Authorization Request, p. 5 of Plaintiff's Medical Records), but plaintiff's progress notes provide that, on September 27, 2004, Dr. David Prough's office was called about the consult and Dr. Prough's nurse reported that Dr. Prough had said there was no need for plaintiff to see Dr. Axelson because all of plaintiff's tests were negative (Progress Notes, p. 39 of Plaintiff's Medical Records).  Plaintiff's progress notes for September 28, 2004 indicate that, while Dr. Prough wrote an order sheet stating that plaintiff should be seen by Dr. Axelson, he did not mention such a visit in the 409 report.  The progress notes for that date also indicate the need for a decision  (Progress Notes, p. 38 of Plaintiff's Medical Records)

The progress notes for October 7, 2004 indicate that Dr. Prough called Sawhney and discussed plaintiff's health.  Sawhney asked for the reason to send plaintiff to see Dr. Axelson and Dr. Prough responded that, while there was no such reason, plaintiff insisted that she be seen by an oncologist.  Sawhney then requested a follow-up statement from Dr. Prough.  (Progress Notes, p. 37 of Plaintiff's Medical Records)  Dr. Prough wrote the follow-up statement that day. In a letter to Sawhney, Dr. Prough wrote that, while in his opinion everything was fine, plaintiff has apparently been complaining to Sawhney about the possibility of her having malignancy. Dr. Prough also wrote that he did not recall ordering a referral to Dr. Axelson and that, if he did, it was only in reaction to plaintiff's persistence and hysteria. Dr. Prough further wrote that, given

- 10 -

plaintiff's persistent concerns, plaintiff may benefit from a visit to Dr. Axelson and hearing that she was fine directly from him.  (Letter, pp. 147-148 of Plaintiff's Medical Records)

On October 14, 2004, plaintiff and Sawhney spoke about plaintiff's health.  (Progress Notes, p. 36 of Plaintiff's Medical Records)  At that meeting, plaintiff acknowledged that Dr. Prough had stated she did not need a referral to see Dr. Axelson.  (Plaintiff's Deposition, p. 114)

On January 20, 2005, plaintiff was seen by Dr. Nichols for plaintiff's annual gynecological exam.  At that visit, plaintiff asked questions regarding osteoporosis and her thyroid and Dr. Nichols told her that those medical issues would be addressed by the medical service provider at the chronic care clinic.  (Progress Notes, p. 649 of Plaintiff's Medical Records)  Dr. Nichols also wrote in plaintiff's progress notes that plaintiff constantly threatened to sue or continue her suit if things were not done for her.  (Progress Notes, p. 649 of Plaintiff's Medical Records)

On March 3, 2005, the Garcia Laboratory issued a report regarding plaintiff that included a finding that plaintiff's cholesterol was 314 mg/dl.  According to that report, "high" cholesterol is greater than or equal to 240 mg/dl.  (Garcia Laboratory Report, March 3, 2005, attached as Appendix V to Plaintiff's Response to D/E #117)

On March 4, 2005, plaintiff requested a mammogram.  Plaintiff also asked about why she had not been referred to Dr. Axelson for her osteoporosis and whoever wrote the progress notes responded that there was no need for a referral because plaintiff was already receiving the necessary treatment.  (Progress Notes, p. 646 of Plaintiff's Medical Records)

On April 20, 2005, plaintiff was again informed that her osteoporosis would be treated by her medical service provided and not by her oncologist.  Plaintiff was also informed that her mammogram was pending.  (Progress Notes, p. 357 of Plaintiff's Medical Records)

On May 12, 2005, plaintiff underwent a bilateral diagnostic mammogram.  The results of that mammogram were normal.  (Letter, p. 422 of Plaintiff's Medical Records)

On August 31, 2005, Dr. Nichols wrote that he had reviewed plaintiff's records and, while plaintiff continued to have complaints and concerns, she is receiving the appropriate medical care and does not need to see any outside specialists for her breast.  Dr. Nichols also recommended that plaintiff receive annual mammograms and clinical breast exams.  Dr. Nichols further wrote that plaintiff did not have any fibroids of significance.  (Progress Notes, p. 347 of Plaintiff's Medical Records)

On May 12, 2006, plaintiff underwent a bilateral diagnostic mammogram.  There was no evidence of malignancy in either breast and all findings were benign.  (Report, pp. 482-483 of Plaintiff's Medical Records)  On June 6, 2006, another breast exam was done and there were no changes in plaintiff's condition.  (Progress Notes, p. 330 of Plaintiff's Medical Records)

On January 22, 2007, plaintiff underwent a whole body scan.  That scan revealed an "Abnormal increased concentration of radioactivity in the junction of body and manubrium sterni, and in the multiple (3) mid dorsal vertebrae, most likely due to metastasis" and "Abnormal uptake in the bilateral tibial shafts, most likely due to shin splints.  Posterior arthopathy is less likely as a possibility.  Clinical correlation of the plain radiographs of both tibias and fibulas is suggested for further evaluation."  No other areas of abnormal changes in

concentration of radioactivity were seen in plaintiff's skeleton.  (Report, attached as part of Appendix X to D/E #126)

On January 23, 2007, an x-ray of plaintiff's thoracic spine demonstrated no evidence of any significant changed and minimal degenerative disk disease changes.  (Radiology Report, p. 533 of Plaintiff's Medical Records)  An x-ray of plaintiff's cervical spine taken on the same day was also negative.  (Radiology Report, p. 534 of Plaintiff's Medical Records)

On March 6, 2007, plaintiff underwent an MRI of her thoracic spine.  That MRI revealed no evidence of metastatic lesion or osseous fracture (Report, p. 411 of Plaintiff's Medical Records) while further x-rays showed mild degenerative changes of the mid thoracic spine and no evidence of metastatic disease to bone (Report, p. 412 of Plaintiff's Medical Records).

On June 6, 2007, plaintiff underwent a bilateral diagnostic mammogram.  That mammogram revealed no radiographic evidence of malignancy.  (Radiology Report, pp. 408-409 of Plaintiff's Medical Records)

Further facts will be included in the discussion section as needed.

### B. Procedural History

On June 29, 2004, plaintiff filed this *pro se* civil rights action under 42 U.S.C. § 1983 against sixteen prison officials, alleging that they violated her rights under the Eighth Amendment (D/E #3).  This matter was referred to this court for all pretrial proceedings (D/E #5).  On November 4, 2004, this court ordered plaintiff to file an amended complaint on the ground that her original eighty-six (86) page complaint did not meet the requirements of Fed. R. Civ. P. 89(a) (D/E #40).

Plaintiff filed an amended complaint pursuant to this court's order and, in that amended complaint, she alleges seven claims (D/E #45). The first claim arises from Dr. Sawhney's alleged failure to remove sutures from plaintiff's left ear and left arm. Counts two, three, four, and six of the amended complaint are based upon other defendants' alleged failure to provide plaintiff with certain prescribed medication in a timely manner.

Plaintiff alleges in count five of the amended complaint that defendants failed to provide her with necessary mammograms in a timely manner and that when a mammogram was finally performed, they refused to provide her with the results thereof. In count seven, plaintiff alleges that she was improperly denied access to her oncologist, endocrinologist, and gynecologist.

On September 29, 2004, defendants Armstrong, Jenkinson, Hynes, Bryant, Rawlins, Honor, Yukins, Epp, and Davis filed a motion to dismiss (D/E #33). On October 4, 2004, defendants Sawhney and Nurse Nichols filed a motion to dismiss (D/E #34).

On December 21, 2004, this court issued a report and recommendation stating that plaintiff's amended complaint should be dismissed with prejudice as to defendants Yukins, Armstrong, Jenkinson, Allen, Honor, Davis, Epp, and Hynes pursuant to Fed. R. Civ. P. 12(b)(6) because plaintiff failed to state a claim upon which relief can be granted against those defendants. This court also recommended that the amended complaint be dismissed in its entirety, without prejudice, for failure to exhaust administrative remedies unless, within twenty-one (21) days of the report and recommendation, plaintiff filed a second amended complaint deleting the following unexhausted claims: (a) all claims against defendants Dosanjh, Dr. Nichols and Nurse Nichols, and (b) Count five of the amended complaint against defendant Bryant. This court further recommended that the amended complaint be dismissed without

- 14 -

prejudice as to defendants Raguchas and Nurse Davis pursuant to Fed. R. Civ. P. 4(m) because of a lack of timely service.

On January 5, 2005, plaintiff filed her second amended complaint (D/E #50). In that complaint, plaintiff alleges seven claims against Sawhney, Bryant and Rawlins. The first claim arises from Sawhney's alleged failure to remove sutures from plaintiff's left ear and left arm. Plaintiff alleges that on February 21, 2002, she underwent surgery on her left ear and left arm at Duane Waters Hospital in Jackson, Michigan. Sutures were placed in her left ear and left arm following the surgery. Upon her return to SCF from the hospital, plaintiff advised Sawhney that according to the surgeon's instructions, the sutures in her left ear were to be removed in eight days, and the sutures in her left arm were to be removed in nine days. When the sutures were not removed within the time frame set forth in the surgeon's instructions, plaintiff requested an appointment with Sawhney. Plaintiff was scheduled to see Sawhney on March 11, 2002, but the appointment was cancelled, and no subsequent appointment was made. Plaintiff eventually had another inmate remove the sutures, which had become ingrown, red, and irritated. Plaintiff alleges that Sawhney's failure to remove the sutures in a timely manner constituted deliberate indifference to her medical needs.

Counts two, three, four and six of the second amended complaint are based upon Sawhney and Rawlins' alleged failure to provide plaintiff with certain prescribed medications in a timely manner. Plaintiff alleges that she saw an oncologist on February 14, 2002, and that the oncologist diagnosed her with osteoporosis, which plaintiff claims was a result of the chemotherapy she underwent for breast cancer. The oncologist prescribed four medications to treat plaintiff's osteoporosis: Fosamax, Calcium, Vitamin D, and Vitamin E. In addition,

plaintiff suffers from hyperthyroidism and was prescribed Levoxyl for that condition.  Plaintiff

was also prescribed Naproxin for severe migraine headaches.  Plaintiff alleges that despite her

numerous requests, and despite the filing of several grievances, the prescriptions were either not

filled at all or were not filled in a timely manner, causing her joint pain, undue suffering, and

other physical damage.

 Plaintiff alleges in count five of the second amended complaint that Sawhney failed to

provide her with necessary mammograms in a timely manner and that when a mammogram was

finally performed, they refused to provide her with the results thereof.  In count seven, plaintiff

alleges that she was improperly denied access to her oncologist and endocrinologist by Sawhney

and Bryant, and that she was improperly denied access to a gynecologist by Sawhney.

 On February 22, 2005, Judge O'Meara entered an order adopting this court's report and

recommendation (D/E #59).  As stated by Judge O'Meara:

> it is hereby **ORDERED** that Magistrate Judge Morgan's
> December 21, 2004 report and recommendation is **ADOPTED**.
>
> It is further **ORDERED** that Plaintiff's Amended Complaint be
> **DISMISSED WITH PREJUDICE** as to defendants Yukins,
> Armstrong, Jenkinson, Allen, Honor, Acting Warden Davis, Epp,
> and Hynes pursuant to Fed. R. Civ. P. 12(b)(6).
>
> It is further **ORDERED** that the plaintiff is permitted leave to file
> a second amended complaint which deletes all unexhausted claims.
> In fact, plaintiff filed such a complaint on January 5, 2005.  As a
> result, the remaining defendants in this case are Sawhney, Bryant,
> and Rawlins.

[D/E #59, pp. 1-2 (emphasis in original)]

 On April 18, 2005, defendants Bryant and Rawlins filed a motion for summary judgment

(D/E #71).  On April 29, 2005, defendant Sawhney filed a renewed motion to dismiss (D/E #74).

- 16 -

On June 9, 2005, this court issued a report and recommendation stating that defendants' motions should be granted and plaintiff's claims should be dismissed without prejudice in light of changes to case law since Judge O'Meara's February 22, 2005 order, specifically <u>Jones Bey v. Johnson</u>, 407 F.3d 801 (6th Cir. 2005), in which the Sixth Circuit instructed the district courts that they must completely dismiss all complaints with mixed exhausted and unexhausted claims (D/E #78).

Plaintiff objected to this court's second report and recommendation (D/E #80), but Judge O'Meara adopted it on July 13, 2005 (D/E #81). Judge O'Meara also entered judgment in favor of the remaining defendants that same day (D/E #82).

Plaintiff subsequently appealed the dismissal of her complaint (D/E #89) and, on June 14, 2007, the Sixth Circuit entered an order vacated the district court's order and remanding this case for further proceedings (D/E #92). The Sixth Circuit's decision was based on the holding of a United States Supreme Court case decided after plaintiff's case was dismissed, <u>Jones v. Bock</u>, 127 S.Ct. 910 (2007). In <u>Jones</u>, the Supreme Court held, in the pertinent part, that where a complaint contains both exhausted and unexhausted claims, the district court should proceed with the exhausted claims while dismissing the unexhausted claims, rather than dismissing the complaint in its entirety. <u>Jones</u>, 127 S.Ct. at 923-925.

On August 24, 2007, plaintiff filed a motion to reinstate Dr. Nichols as a defendant (D/E #100). In that motion, plaintiff argued that, in light of recent case law, she should be deemed to have exhausted her administrative remedies with respect to her claims against Dr. Nichols and he should be reinstated as a defendant.

- 17 -

On September 11, 2007, this court granted plaintiff's motion to reinstate Dr. Nichols as a defendant (D/E #106).

On November 16, 2007, defendant Sawhney filed a motion for summary judgment in which she argued that no genuine issue of material fact was in dispute with respect to plaintiff's claims against her (D/E #117). Plaintiff received an extension of time in which to file a response (D/E #123) and she filed her response in opposition to Sawhney's motion on February 28, 2008 (D/E #126). On March 5, 2008, defendants Bryant and Rawlins filed a motion for summary judgment arguing that they were entitled to summary judgment on the same basis (D/E #128). Plaintiff received an extension of time in which to file a response (D/E #123) and she filed her response in opposition to Bryant and Rawlins' motion on May 6, 2008 (D/E #132).

On August 20, 2008, this court issued a report and recommendation finding that defendants' motions should be granted in part (D/E #135). As found by this court, the only claims in which genuine issues of material fact were in dispute were (1) plaintiff's claim arising from Sawhney's alleged failure to remove sutures from plaintiff's left ear and left arm, and (2) plaintiffs' claims against Bryant and Rawlins relating to the treatment for osteopenia.

Plaintiff, Sawhney, Bryant and Rawlins all objected to that report and recommendation (D/E #136, #137, #145). On September 18, 2008, Judge O'Meara entered an order accepting and adopting this court's report and recommendation (D/E #143). Plaintiff subsequently filed an appeal of that order (D/E #150), but her appeal was rejected by the Sixth Circuit as an improper interlocutory appeal (D/E #165).

On November 6, 2008, this court ordered that defendants provide Dr. Nichols address under seal (D/E #159). That address was provided (D/E #162) and, following two orders directing service (D/E #163, #169), Dr. Nichols was eventually served (D/E #171).

On May 1, 2009, Dr, Nichols filed an answer to plaintiff's second amended complaint (D/E #173). This court then issued a scheduling order (D/E #179). Pursuant to that scheduling order, all discovery was due September 1, 2009 and the dispositive motion cutoff was October 1, 2009.

### C. Motion Before the Court

On August 8, 2005, Dr. Nichols filed the motion for summary judgment pending before the court (D/E #189). In that motion, Dr. Nichols argues that he is entitled to summary judgment because no genuine issue of material fact is in dispute with respect to plaintiff's claims that she had a serious medical need or that Dr. Nichols was deliberately indifferent to plaintiff's serious medical needs. Dr. Nichols also argues that he is entitled to summary judgment because he is not a state actor.

On September 15, 2009, plaintiff filed a response in opposition to Dr. Nichols' motion for summary judgment (D/E #198). In that response, plaintiff argues that Dr. Nichols was involved in all aspects of plaintiff's treatment and that he was also deliberately indifferent to plaintiff's serious medical needs. Plaintiff also argues that Dr. Nichols was a state actor.

On September 25, 2009, Dr. Nichols filed a reply to plaintiff's response (D/E #200). In that reply, Dr. Nichols argues that plaintiff failed to demonstrate any serious medical needs or deliberate indifference with respect to the conditions for which Dr. Nichols treated her.

On October 2, 2009, plaintiff filed a response to Dr. Nichols' reply in which plaintiff reiterated her earlier arguments while also providing evidence relating to more recent medical treatment of plaintiff (D/E #207).

### III. Standard of Review

Dr. Nichols moves for summary judgment pursuant to Federal Rule of Civil Procedure 56(b), which states that "[a] party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move without or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof."  Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-movant.  See Matsushita Electric Industrial Co., Ltd. et al. v. Zenith Radio Corp., et. al., 475 U.S. 547, 587, 106 S.Ct. 1348, 1356 (1986); see also B.F. Goodrich Co. v. U.S. Filter Corp., 245 F.3d 587, 591-92 (6th Cir. 2001).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  Once the moving party has carried his burden, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial."  Matsushita, 475 U.S. at 587, 106 S.Ct. 1348.  The opposing party cannot merely rest upon the allegations contained in his pleadings.  Rather, he must submit evidence demonstrating that material issues of fact exist.  Banks v. Wolfe County Bd. of Educ., 330 F.3d 888, 892 (6th Cir. 2003); Fed. R. Civ. P. 56(e).

"Where the record taken as a whole could not lead a rational trier of <u>fact</u> to find for the non-moving party, there is no 'genuine issue for trial.'"   <u>Matsushita</u>, 475 U.S. at 587, 106 S.Ct. 1348 (quoting <u>First National Bank of Arizona v. Cities Service Co.</u>, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592 (1968)).

## IV.  Discussion

As a preliminary matter, this court would note that Dr. Nichols is not named as a defendant in plaintiff's second amended complaint and that there are no allegations made against him in that pleading.  Moreover, while Dr. Nichols was reinstated as a defendant after that second amended complaint was filed, plaintiff never amended her complaint to add any claims against him.  Plaintiff does broadly assert in her response to Dr. Nichols' motion for summary judgment that Dr. Nichols conspired with the other remaining defendants and is therefore liable for all of plaintiff's medical care, but there are no such claims in the second amended complaint itself.  Therefore, Dr. Nichols should be dismissed from this case on the basis that there are no claims pending against him.

To the extent plaintiff does assert any claims against Dr. Nichols, Dr. Nichols first argues that he is entitled to summary judgment on the basis that no genuine issue of material fact is in dispute with respect to plaintiff's claims that he was deliberately indifferent to plaintiff's serious medical needs and he is entitled to judgment as a matter of law.  Dr. Nichols also argues that he is entitled to summary judgment because he is not a state actor.  Each of those arguments will be addressed in turn.

### A. Deliberate Indifference to Serious Medical Need

- 21 -

A prisoner's claim that his constitutional right to medical treatment was violated is analyzed under the Eighth Amendment.  See Estelle v. Gamble, 429 U.S. 97, 103-104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).  To state a § 1983 claim for a violation of a prisoner's Eighth Amendment rights due to inadequate medical care, the prisoner must allege facts evidencing a deliberate indifference to serious medical needs.  Wilson v. Seiter, 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).  To succeed on a claim of deliberate indifference, plaintiff must satisfy two elements, an objective one and a subjective one.  Wilson, 501 U.S. at 300.

The objective component is satisfied by a showing that plaintiff had a serious medical need.  Wilson, 501 U.S. at 297.  As clarified by the Sixth Circuit, a reviewing court should first determine whether the injury is "obvious," i.e. "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Blackmore v. Kalamazoo County, 390 F.3d 890, 897 (6th Cir. 2004), quoting Gaudreault v. Municipality of Salem, 923 F.2d 203, 208 (1st Cir. 1990).  "'Where the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person,' this obviousness is itself sufficient to satisfy the objective component of the adequate medical care test."  Johnson v. Karnes, 398 F.3d 868, 874 (6th Cir. 2005), quoting Blackmore v. Kalamazoo County, 390 F.3d 890, 899 (6th Cir. 2004).  Therefore, if there is an obvious need for medical treatment, then the court must only determine whether the delay in securing that care was reasonable.  Blackmore, 390 F.3d at 899-900.

 If, however, the need involves minor needs or non-obvious complaints of a serious need for medical care, the plaintiff "'must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment.'"  Johnson, 398 F.3d at 874, quoting

- 22 -

Napier v. Madison County, Kentucky, 238 F.3d 739, 742 (6th Cir. 2001).  As stated in

Blackmore, Napier controls in cases where the injury is not apparent or appears to be relatively

minor:

> In sum, the "verifying medical evidence" requirement is relevant
> to those claims involving minor maladies or non-obvious
> complaints of a serious need for medical care.... In a word, Napier
> does not apply to medical care claims where facts show an obvious
> need for medical care that laymen would readily discern as
> requiring prompt medical attention by competent health care
> providers. Napier applies where the plaintiff's "deliberate
> indifference" claim is based on the prison's failure to treat a
> condition adequately, or  where the prisoner's affliction is
> seemingly minor or non-obvious.  In such circumstances, medical
> proof is necessary to assess whether the delay caused a serious
> medical injury.

[Blackmore, 390 F.3d at 898. citing Napier, 238 F.3d at 742.]

To satisfy the subjective component of the adequate medical care test, the plaintiff must

demonstrate that the defendant "subjectively perceived a risk of harm and then disregarded it."

Comstock v. McCrary, 273 F.3d 693, 703 (6th Cir. 2001).  Deliberate indifference is

characterized by obduracy and wantonness, not inadvertence or good faith error.  Gibson v.

Foltz, 963 F.2d 851, 853 (6th Cir. 1992).  Moreover, where the prisoner has received some

medical attention and the dispute is over the adequacy of the treatment, courts are reluctant to

second guess medical judgments, Westlake v. Lucas, 537 F.2d 857, 860 n. 5 (6th Cir. 1976), and

deliberate indifference does not include negligence in diagnosing a medical condition.  Sanderfer

v. Nichols, 62 F.3d 151, 154 (6th Cir. 1995) (citations omitted).  However, it is not necessary for

a plaintiff to "show that the official acted 'for the very purpose of causing harm or with

knowledge that harm will result.'"  Comstock, 273 F.3d at 703, quoting Farmer, 511 U.S. at 835.

- 23 -

Put simply, "deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." Comstock, 273 F.3d at 703, quoting Farmer, 511 U.S. at 835.

In this case, as stated in his affidavit, Dr. Nichols, an OB/GYN physician, provided specialty care to plaintiff on a referral basis. (Affidavit of Dr. Nichols, ¶¶ 2, 6-7; attached as Ex. C to Dr. Nichols' Motion for Summary Judgment) As demonstrated in plaintiff's medical records, Dr. Nichols saw, treated or examined plaintiff on several occasions. On January 21, 2004, a request was made by Nurse Nichols (no relation) for a pelvic ultrasound and that request was later approved. (CMS Pended or Denied Form, p. 20 of Plaintiff's Medical Records; CMS Authorization Requests, p. 24 of Plaintiff's Medical Records) However, after seeing plaintiff, Dr. Nichols stated plaintiff did not need a pelvic ultrasound. (CMS Pended or Denied Form, p. 20 of Plaintiff's Medical Records; Progress Notes, p. 49 of Plaintiff's Medical Records) According to Dr. Nichols, plaintiff probably had adhesions from a previous surgery. (Progress Notes, p. 49 of Plaintiff's Medical Records) Dr. Nichols also stated that he had answered plaintiff's questions. (Progress Notes, p. 49 of Plaintiff's Medical Records) On January 20, 2005, plaintiff was seen by Dr. Nichols for plaintiff's annual gynecological exam. At that visit, plaintiff asked questions regarding osteoporosis and her thyroid and Dr. Nichols told her that those medical issues would be addressed by the medical service provider at the chronic care clinic. (Progress Notes, p. 649 of Plaintiff's Medical Records) Dr. Nichols also wrote in plaintiff's progress notes that plaintiff constantly threatened to sue or continue her suit if things were not done for her. (Progress Notes, p. 649 of Plaintiff's Medical Records) On August 31, 2005, Dr. Nichols wrote that he had reviewed plaintiff's records and, while plaintiff continued to

have complaints and concerns, she is receiving the appropriate medical care and does not need to

see any outside specialists for her breast.  Dr. Nichols also recommended that plaintiff receive

annual mammograms and clinical breast exams.  Dr. Nichols further wrote that plaintiff did not

have any fibroids of significance.  (Progress Notes, p. 347 of Plaintiff's Medical Records)

Given the above evidence of Dr. Nichols' treatment of plaintiff, he is entitled to summary

judgment.  In her first amended complaint, which is most recent pleading containing any

allegations against Dr. Nichols, plaintiff asserts that Dr. Nichols was deliberately indifferent to

plaintiff's serious medical needs by (1) failing to ensure that plaintiff received timely and

necessary mammograms (First Amended Complaint, pp. 9-13) and (2) denying plaintiff referrals

and visits with an oncologist, endocrinologist, and gynecologist (First Amended Complaint, pp.

14-27).  However, as discussed below, there is no genuine issue of material fact in dispute with

respect to either of those claims and Dr. Nichols is entitled to judgment as a matter of law.

**1. Mammograms**

As discussed above, to succeed on a claim of deliberate indifference, plaintiff must

satisfy two elements, an objective one and a subjective one.  Wilson, 501 U.S. at 300.  In this

case, no genuine issue of material fact is in dispute as to either of those elements in plaintiff's

claim regarding a denial of timely mammograms and Dr. Nichols is entitled to judgment as a

matter of law.

With respect the objective element of the deliberate indifference claim, a plaintiff must

have had a serious medical need.  Wilson, 501 U.S. at 297.  Where, as in this case, the plaintiff

has non-obvious complaints of a serious need for medical care, the plaintiff "'must place

verifying medical evidence in the record to establish the detrimental effect of the delay in

- 25 -

medical treatment.'"  Johnson, 398 F.3d at 874, quoting Napier, 238 F.3d at 742.  Here, while

plaintiff did not undergo any mammograms between November 7, 2001 and September 9, 2003

as she should have (Mammography Report, p. 277 of Plaintiff's Medical Records; Radiology

Report, p. 156 of Plaintiff's Medical Records), there is no evidence suggesting plaintiff suffered

any injury from a delay in receiving mammograms.  The September 9, 2003 mammogram only

revealed the presence of a few benign-appearing calcifications and there were no suspicious

clusters of microcalcifications.  Moreover, when that report was compared with previous

mammograms it was determined that the calcifications were stable.  (Radiology Report, p. 157 of

Plaintiff's Medical Records)  Subsequently, plaintiff underwent mammograms on August 4,

2004, May 12, 2005, May 12, 2006 and June 6, 2007, and all of those mammograms were

negative.  (Report, p. 150 of Plaintiff's Medical Records; Letter, p. 422 of Plaintiff's Medical

Records; Report, pp. 482-483 of Plaintiff's Medical Records; Radiology Report, pp. 408-409 of

Plaintiff's Medical Records)  Plaintiff herself concedes that her cancer has been in remission

since 1995.  (Plaintiff's Deposition, p. 97)  Given that concession, as well as the results of the

numerous mammograms performed since the gap in plaintiff's treatment, it is clear that no

genuine issue of material fact exists as to whether plaintiff suffered any injury from a delay in

receiving mammograms.  Therefore, plaintiff did not have a serious medical need and Dr.

Nichols is entitled to summary judgment on plaintiff's claim regarding timely mammograms.

     With respect to the subjective element of the deliberate indifference claim, plaintiff must

demonstrate that the defendant "subjectively perceived a risk of harm and then disregarded it."

Comstock, 273 F.3d at 703.  Here, plaintiff did not undergo any mammograms between

November 7, 2001 and September 9, 2003, but Dr. Nichols did not start treating plaintiff until

January 21, 2004 and, therefore, he cannot be held responsible for any delay in plaintiff receiving a mammogram.  Moreover, as discussed above, plaintiff has received her annual mammograms since September 9, 2003.  Furthermore, on August 31, 2005, Dr. Nichols specifically recommended that plaintiff continue to receive annual mammograms and clinical breast exams.  (Progress Notes, p. 347 of Plaintiff's Medical Records)  Given that history of treatment, which plaintiff does not dispute, no genuine issue of material fact exists as to whether Dr. Nichols disregarded any perceived risk of harm and she is entitled to summary judgment with respect to plaintiff's claim that Dr. Nichols was deliberately indifferent to plaintiff's serious medical needs by failing to ensure that plaintiff received timely mammograms.

### 2. Specialists

As discussed above, plaintiff also alleges that Dr. Nichols was deliberately indifferent to plaintiff's serious medical needs by denying plaintiff referrals and visits with an oncologist, endocrinologist, and gynecologist.  For the reasons discussed below, Dr. Nichols is entitled to summary judgment on each of those claims.

#### a. Oncologist

As described above, Dr. Axelson, an oncologist, examined plaintiff on February 14, 2002, and, after noting that plaintiff was complaining of back pain and that she had an abnormal bone scan,  Dr. Axelson recommended both that plaintiff undergo a bone densitometry study along with thoracic films and that plaintiff start taking the medication Fosamax for osteopenia and osteoporosis prevention.  (Clinic Consultation, pp. 208-209 of Plaintiff's Medical Records) Moreover, both plaintiff's progress notes and a specialty consult report reflect that plaintiff was

to return to the clinic at the Duane Waters Hospital for a follow-up visit with Dr. Axelson in three months.  (Progress Notes and Specialty Consult Report, pp. 83, 142 of Plaintiff's Medical Records)  While plaintiff was later diagnosed with osteopenia, it is clear from the record that she never returned to see Dr. Axelson.

However, even assuming *arguendo* that plaintiff's osteopenia constitutes a serious medical need, there is no evidence suggesting that Dr. Nichols was deliberately indifferent to that serious medical need.  Dr. Axelson wanted to see plaintiff again due to osteopenia and osteoporosis prevention. but Dr. Nichols was not plaintiff's primary care physician, he only provided plaintiff with specialty care, and he was not treating plaintiff for osteopenia or osteoporosis prevention.  (Affidavit of Dr. Nichols, ¶¶ 2, 6-7; Progress Notes, p. 649 of Plaintiff's Medical Records)  Moreover, the progress notes in plaintiff's medical records clearly demonstrate that it was Dr. Sawhney and Dr. Prough who decided to deny the referral and treat plaintiff without Dr. Axelson.  (Progress Notes, pp. 37, 39, 45, 58, and 357 of Plaintiff's Medical Records)  For example, on September 27, 2004 and October 7, 2004, Dr. Sawhney specifically discussed with Dr. Prough whether plaintiff needed to see Dr. Axelson.  The conclusion reached after those discussions was that plaintiff did not need to see Dr. Axelson again, though Dr. Prough did write that, given plaintiff's persistent concerns, plaintiff may benefit from a visit to Dr. Axelson and hearing directly from him that she was fine.  (Progress Notes, pp. 37, 39; Letter, pp. 147-148 Plaintiff's Medical Records)

Given Dr. Nichols' lack of personal involvement in the decision to deny the referral to Dr. Axelson, as well as the limited focus of Dr. Nichols' treatment, no genuine issue of material fact exists with respect to the subjective component of plaintiff's claim that Dr. Nichols was

deliberately indifferent to plaintiff's serious medical needs by denying a referral to an oncologist and Dr. Nichols is entitled to summary judgment on that claim.

### b. Endocrinologist

On November 26, 2002, Dr. Casey wrote that, because plaintiff has a history of thyroid disease, he would arrange a consultation with Dr. Qutob, an endocrinologist. (Clinic Consultation, p. 175 of Plaintiff's Medical Records) From the record before the court, it appears that plaintiff never had a consultation with Dr. Qutob.

Assuming *arguendo* that plaintiff's history of thyroid disease constitutes a serious medical need, there is no evidence suggesting that Dr. Nichols was deliberately indifferent to that serious medical need. Dr. Nichols was not plaintiff's primary care physician, he only provided plaintiff with specialty care, and he was not treating plaintiff for any thyroid problems. (Affidavit of Dr. Nichols, ¶¶ 2, 6-7; Progress Notes, p. 649 of Plaintiff's Medical Records) Plaintiff presents no evidence that Dr. Nichols was involved in plaintiff's thyroid treatment[5] and, given that lack of evidence and Dr. Nichols' limited role in plaintiff's overall treatment, no genuine issue of material fact exists with respect to the subjective component of plaintiff's claim that Dr. Nichols was deliberately indifferent to plaintiff's serious medical needs by denying a referral to an endocrinologist and Dr. Nichols is entitled to summary judgment on that claim.

### c. Gynecologist

---

[5]In a previous report and recommendation, this court did note that Dr. Nichols had opined that plaintiff did not see any outside specialists, but it is now clear that Dr. Nichols' opinion was limited to outside treatment for plaintiff's breasts and the opinion did not involve the treatment for thyroid disease at issue here.

As discussed above, on January 21, 2004, a request was made by Nurse Nichols, for a pelvic ultrasound and that request was later approved. (CMS Pended or Denied Form, p. 20 of Plaintiff's Medical Records; CMS Authorization Requests, p. 24 of Plaintiff's Medical Records) However, after seeing plaintiff, Dr. Nichols stated plaintiff did not need a pelvic ultrasound. (CMS Pended or Denied Form, p. 20 of Plaintiff's Medical Records; Progress Notes, p. 49 of Plaintiff's Medical Records) According to Dr. Nichols, plaintiff probably had adhesions from a previous surgery. (Progress Notes, p. 49 of Plaintiff's Medical Records) Dr Nichols also stated that he had answered plaintiff's questions. (Progress Notes, p. 49 of Plaintiff's Medical Records)

Plaintiff now argues that the failure to perform the pelvic ultrasound or refer plaintiff to another gynecologist for the pelvic ultrasound constitutes deliberate indifference to plaintiff's serious medical needs. However, even assuming *arguendo* that plaintiff has a serious medical need, plaintiff can only demonstrate that she disagreed with Dr. Nichols' medical judgment and, where the prisoner has received some medical attention and the dispute is over the adequacy of the treatment, courts are reluctant to second guess medical judgments, Westlake, 537 F.2d at 860 n. 5. Deliberate indifference is characterized by obduracy and wantonness, Gibson, 963 F.2d at 853, and there no evidence of either here. By merely asserting that Dr. Nichols' medical judgment was wrong, plaintiff has failed to demonstrate that a genuine issue of material fact exists with respect to the subjective component of plaintiff's claim that Dr. Nichols was deliberately indifferent to plaintiff's serious medical needs by referring plaintiff to another gynecologist to perform a pelvic ultrasound and Dr. Nichols is entitled to summary judgment on that claim.

- 30 -

**B. State Actor**

Dr. Nichols also argues that he is entitled to summary judgment because he is not a state actor.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  West v. Atkins, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (citations omitted).  One acts under color of state law when one exercises power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."  United States v. Classic, 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941).  If a defendant's conduct satisfies the state-action requirement of the Fourteenth Amendment, then the defendant is considered to be acting under color of state law.  West, 487 U.S. at 49; Lugar v. Edmondson Oil Co., 457 U.S. 922, 928, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982).  Therefore, the court must determine whether Dr. Nichols performed a state action.

Dr. Nichols is not a government employee or official.  He is a private party.  In certain circumstances, however, the actions of even private parties may be deemed to be state action "when the conduct causing the deprivation of a federal right may be fairly attributable to the state."  Revis v. Meldrum, 489 F.3d 273, 289 (6th Cir. 2007) (quoting Lugar v. Edmundson Oil Co., 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)).  This determination involves a two-part inquiry.  "First, the deprivation in question must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible."  Revis, 489 F.3d at 289 (quoting Lugar, 457 U.S. at 937).  And

second, "the party charged with the deprivation must be a person who may fairly be said to be a state actor." Revis, 489 F.3d at 289 (quoting Lugar, 457 U.S. at 937).

For a private actor-defendant's acts to be considered state action, the "actions [must] so approximate state action that they may be fairly attributed to the state." Lansing v. City of Memphis, 202 F.3d 821, 828 (6th Cir. 2000).  The United States Court of Appeals for the Sixth Circuit uses three tests to determine if a private actor-defendant's conduct amounts to state action.  These are commonly referred to as: 1) the public-function test; 2) the state-compulsion test; and 3) the symbiotic relationship or nexus test. Boykin v. Van Buren Twp., 479 F.3d 444,452 (6th Cir. 2007) (quoting Chapman v. Higbee Co., 319 F.3d 825, 833 (6th Cir. 2003)); Lansing, 202 F.3d at 828.  Each of these tests must be examined to determine if Dr. Nichols' acts constitute state action.

### 1. Public-function Test

Under the  public-function test, "a private party is deemed a state actor if he or she exercised powers traditionally reserved exclusively to the state." Chapman, 319 F.3d at 833. This test has typically been interpreted very narrowly, and has been utilized to find state action on the part of a private actor only in rare circumstances.  Chapman, 319 F.3d at 833-34.  The few examples of state action under this public-function test illustrate its lack of expansive utilization by the courts.  See, *e.g.*, Flagg Bros. v. Brooks, 436 U.S. 149, 157-58, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978) (holding elections is public function); Jackson v. Metropolitan Edison Co., 419 U.S. 345, 352-53, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) (eminent domain is public function); Marsh v. Alabama, 326 U.S. 501, 505-09, 66 S.Ct. 276, 90 L.Ed. 265 (1946) (company-owned town is public function).

- 32 -

Importantly, when a court addresses the issue of state action under the public-function test, it must conduct a historical analysis of the activity in question to determine whether the activity truly is one that has been traditionally and exclusively performed by the state.  Wittstock v. Mark A. Van Sile, Inc., 330 F.3d 899, 902 (6th Cir. 2003); Ellison v. Garbarino, 48 F.3d 192, 196 (6th Cir. 1995) ("Courts that have addressed this issue [public-function test] have typically required some historical analysis to determine whether an action is one traditionally the exclusive prerogative of the state.").  The Sixth Circuit has also made it clear that the burden is on the plaintiff to make this showing of historical evidence or argumentation to the court deciding the issue of state action.  Straub v. Kilgore, 100 Fed. Appx. 379, 385 (6th Cir. 2004) (quoting Wittstock, 330 F.3d at 902); Wittstock, 330 F.3d at 902; Ellison, 48 F.3d at 196.

The relevant standard under the public-function test for determining whether Dr. Nichols acted under color of state law focuses on "the relationship among the State, the physician and the prisoner."  West v. Atkins, 487 U.S. 42, 55-56, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). In determining whether a doctor acted under color of state law, the primary factor is "the physician's function within the state system, not the precise terms of his employment."  West, 487 at 56.  In West, the United States Supreme Court held that the defendant-physician who had contracted with the state to furnish medical services within the confines of the prison to inmates of state-prisons, was acting "under color of state law for purposes of § 1983" when he treated the plaintiff-inmate.  West, 487 U.S. at 57.  The Supreme Court found that the state was affirmatively obligated to provide medical care to the inmate, it had delegated that function to an otherwise private physician, and the physician voluntarily assumed that obligation by contract.  West, 487 U.S. at 56.

Here, Dr. Nichols argues that this case is distinguishable from the factual setting in West because he is a private physician and independent contractor providing specialty services.  The Sixth Circuit has recently found that an oncologist employed by the University of Michigan and holding medical staff privileges at W.A. Foote Hospital in Jackson, Michigan was not a state actor for purposes of § 1983 when she provided care to a prisoner upon referral by a physician at the prison hospital.  See Scott v. Ambani, 577 F.3d 642, 649 (6th Cir. 2009).  The Sixth Circuit determined that the defendant in Scott was not a state actor because her "care and treatment of all patients, including any prisoners which may have required treatment at Foote Hospital, were determined by her own training, experience, and independent medical judgment.  Neither MDOC nor Correctional Medical Services had any influence, direction, or control over the care and treatment of any patient."  Scott, 577 F.3d at 649.  The Sixth Circuit also noted that "[a]s with any private physician, [the defendant] provided treatment and care to the patients at the hospital" and that:

> [the defendant] was able to treat Scott not because she was "clothed with the authority of state law," West, 487 U.S. at 49, 108 S.Ct. 2250, but because she had medical staff privileges at Foote Hospital.  Upon referral by . . . a physician at the prison hospital, Scott could have been treated by any of the radiation oncologists with medical staff privileges. [The defendant]  just happened to be the physician who provided treatment.  As such, [the defendant] was not performing her duties as a state actor in her treatment of Scott and dismissal of the claim against her was proper.

[Scott, 577 F.3d at 649.]

This case is factually similar to West, rather than Scott, and Dr. Nichols should be deemed to be a state actor under the public-function test.  Dr. Nichols was a private physician treating prisoners through an arrangement with Correctional Medical Services, Inc., but the

- 34 -

primary factor in determining whether a doctor acted under color of state law is "the physician's

function within the state system, not the precise terms of his employment." West, 487 at 56.

Moreover, "the fact that a state employee's role parallels one in the private sector is not, by

itself, reason to conclude that the former is not acting under color of state law in performing his

duties." West, 487 U.S. at 57, n. 15. See also Griffin v. Maryland, 378 U.S. 130, 135, 84 S.Ct.

1770, 1773, 12 L.Ed.2d 754 (1964) ( "If an individual is possessed of state authority and

purports to act under that authority, his action is state action. It is irrelevant that he might have

taken the same action had he acted in a purely private capacity...."). Dr. Nichols carried out his

duties at the state prison and the United States Supreme Court has noted:

> That correctional setting, specifically designed to be removed from
> the community, inevitably affects the exercise of professional
> judgment. Unlike the situation confronting free patients, the
> nonmedical functions of prison life inevitably influence the nature,
> timing, and form of medical care provided to inmates

[West, 487 U.S. at 57, n. 15.] In addition to having his examinations are inevitably influenced

by the nature, timing, and form of medical care provided to inmates, the prison context of Dr.

Nichols' actions also ensured that prisoners such as plaintiff could not choose which doctors they

saw. West, 487 U.S. at 57, n. 15.

As discussed above, the relevant standard under the public-function test for determining

whether Dr. Nichols acted under color of state law focuses on "the relationship among the State,

the physician and the prisoner." West, 487 at 56. In this case, viewing the evidence and drawing

all inferences in a light most favorable to plaintiff, as the court must in deciding a motion for

summary judgment, Dr. Nichols was "clothed with the authority of state law," West, 487 U.S. at

49, when he treated plaintiff by virtue of his relationship with the state of Michigan and role

- 35 -

within the state's system of providing medical care.  In determining whether a doctor acted under color of state law, the primary factor is "the physician's function within the state system, not the precise terms of his employment."  <u>West</u>, 487 at 56.  In this case, Dr. Nichols' function within the state system compels the finding that he acted under the color of law when treating plaintiff.

### 2. State-compulsion Test

The state-compulsion test "requires that the state 'exercise such coercive power or provide such significant encouragement, either overt or covert, that in law the choice of the private actor is deemed to be that of the state.'"  <u>Wilcher v. City of Akron</u>, 498 F.3d 516, 519 (6th Cir. 2007) (quoting <u>Wolotsky</u>, 960 F.2d at 1335).  For the activities of the private actor to constitute state action under this test, more is required than merely the approval or acquiescence of the state in the decisions or actions of the private actor.  <u>See</u> <u>Blum v. Yaretsky</u>, 4557 U.S. 991, 1004 (1982).  Here, there is absolutely no evidence that Dr. Nichols was coerced or encouraged by the state into committing any of the alleged acts against plaintiff.  This court therefore finds that the state-compulsion test for state action is not satisfied in this case.

### 3. Symbiotic Relationship or Nexus Test

The third of the state-actions tests is the symbiotic relationship or nexus test.  Under this test, "the action of a private party constitutes state action when there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter maybe fairly treated as that of the state itself."  <u>Wolotsky</u>, 960 F.2d 1331, 1335 (6th Cir. 1992).  Determinations of state action under the nexus test necessarily depend on the unique facts and circumstances presented by each individual case.  "The cases establish no clear standard for

identifying a 'sufficiently close nexus.'" Lansing v. City of Memphis, 202 F.3d 821, 830 (6th Cir. 2000); see also Lugar v. Edmundson Oil Co., 457 U.S. 922, 939, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) (state-action determination is a "necessarily fact-bound inquiry").

The Supreme Court and the Sixth Circuit have provided some guidance to the inquiry. Certain factors have been deemed insufficient, in and of themselves, to establish the required nexus between the private actor's complained-of conduct and the State. Extensive state regulation of a private entity's operations does not establish state action via the nexus test. See, e.g., Rendell-Baker v. Kohn, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982); Adams v. Vandemark, 855 F.2d 312 (6th Cir. 1988); Crowder v. Conlan, 740 F.2d 447 (6th Cir. 1984). Public funding of nearly all of the private actor's activities, as well as the private actor's use of public property, are similarly insufficient to establish the required nexus. See, e.g., Blum v. Yaretsky, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982); Wolotsky, 960 F.2d at 1336; Crowder, 740 F.2d at 450, 453. The minority presence of public officials on the private actor's decision-making board also does not satisfy the nexus test for state action. See, e.g., Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); Lansing, 202 F.3d at 831; Crowder, 740 F.2d at 447. Also, the utilization of public services by private actors does not by itself establish the requisite nexus for state action. See, e.g., Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999); Ellison v. Garbarino, 48 F.3d 192 (6th Cir. 1995). Furthermore, the mere existence of a contract between a governmental agency and a private party is insufficient to create state action. See, e.g, Revis v. Meldrum, 489 F.3d 273, 292 (6th Cir. 2007); McCarthy v. Middle Tennessee Elec. Membership Corp., 466 F.3d

399, 412 (6th Cir. 2006); <u>Simescu v. Emmet County Dept. of Soc. Services</u>, 942 F.2d 372, 375 (6th Cir.1991).

Here, given that it appears that he only treated prisoners and that he only worked at a state correctional facility, there is some evidence suggests that Dr. Nichols had a symbiotic relationship with the state. Nevertheless, as discussed above, courts have traditionally analyzed the relationship between a physician, the state and a prison under the public function test and there does not seem to a basis for finding that Dr. Nichols was a state actor under the nexus test given the above case law.

## V. Conclusion

For the reasons discussed above, the court recommends that Dr. Nichol's motion for summary judgment be **GRANTED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Howard v. Secretary of HHS</u>, 932 F.2d 505, 508 (6th Cir. 1991); <u>United States v. Walters</u>, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. <u>Willis v. Secretary of HHS</u>, 931 F.2d 390, 401 (6th Cir. 1991); <u>Smith v. Detroit Fed'n of Teachers Local 231</u>, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

- 38 -

Within ten (10) days of service of any objecting party's timely filed objections, the

opposing party may file a response.  The response shall be no more than 20 pages in length

unless, by motion and order, the page limit is extended by the court.  The response shall address

each issue contained within the objections specifically and in the same order raised.


S/Virginia M. Morgan
Virginia M. Morgan
United States Magistrate Judge


Dated: December 3, 2009

---

**PROOF OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and plaintiff via
the Court's ECF System and/or U. S. Mail on December 3, 2009.

s/J. Johnson
Case Manager to
Magistrate Judge Virginia M. Morgan