UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMIRA SALEM,

             Plaintiff,               CIVIL ACTION NO. 04-72250

       v.                     DISTRICT JUDGE JOHN CORBETT O'MEARA

MS. YUKINS, MS DAVIS,        MAGISTRATE JUDGE VIRGINIA M. MORGAN
DR. SAWHNEY, DR. NICHOLS,
MS. EPP, MR. ARMSTRONG,
MS. JENKINSON, MS. ELLEN,
MS. HYNES, MS. BRYANT,
MR. HONOR, MS. NICHOLS,
MS. DOSANJH, MS. RAWLINS,
MS. RAGUCHAS, and MS. DAVIS,[1]

             Defendants.
_____/

**REPORT AND RECOMMENDATION
TO DENY BRYANT AND RAWLINS MOTION FOR
SUMMARY JUDGMENT (D/E #201) AND SAWHNEY'S
MOTION FOR SUMMARY JUDGMENT (D/E # 203)**

**I. Introduction**

      Plaintiff, an inmate at the Robert Scott Correctional Facility (SCF) in Plymouth,

Michigan, filed a *pro se* civil rights action under 42 U.S.C. § 1983 against sixteen Michigan

Department of Corrections (MDOC) officials, alleging that they denied her necessary medical

care in violation of the Eighth Amendment.  The matter comes before the court on defendants

Bryant and Rawlins' Motion for Summary Judgment (D/E #201) and defendant Sawhney's

_____

      [1]On February 22. 2005, the Honorable John Corbett O'Meara issued an order dismissing
all of the defendants except Sawhney, Bryant and Rawlins (D/E #59).  Dr. Nichols was later
reinstated as a defendant (D/E #106).  Sawhney, Bryant, Rawlins and Dr. Nichols are the only
defendants remaining in this action.

Motion for Summary Judgment (D/E #203).  The issues found in those motions were raised in earlier motions and the district court judge found that material facts in dispute precluded summary judgment.  No new evidence has been produced here.  For the reasons discussed below, this court recommends that defendants' motions be **DENIED** pursuant to the law of the case doctrine.

## II.  Background

### A. Procedural History

On January 5, 2005, plaintiff filed her second amended complaint in this *pro se* action (D/E #50).  In that complaint, plaintiff alleges seven claims against Sawhney, Bryant and Rawlins.  The first claim arises from Sawhney's alleged failure to remove sutures from plaintiff's left ear and left arm.  Plaintiff alleges that on February 21, 2002, she underwent surgery on her left ear and left arm at Duane Waters Hospital in Jackson, Michigan.  Sutures were placed in her left ear and left arm following the surgery.  Upon her return to SCF from the hospital, plaintiff advised Sawhney that according to the surgeon's instructions, the sutures in her left ear were to be removed in eight days, and the sutures in her left arm were to be removed in nine days.  When the sutures were not removed within the time frame set forth in the surgeon's instructions, plaintiff requested an appointment with Sawhney.  Plaintiff was scheduled to see Sawhney on March 11, 2002, but the appointment was cancelled, and no subsequent appointment was made.  Plaintiff eventually had another inmate remove the sutures, which had become ingrown, red, and irritated.  Plaintiff alleges that Sawhney's failure to remove the sutures in a timely manner constituted deliberate indifference to her medical needs.

Counts two, three, four and six of the second amended complaint are based upon Sawhney and Rawlins' alleged failure to provide plaintiff with certain prescribed medications in a timely manner. Plaintiff alleges that she saw an oncologist on February 14, 2002, and that the oncologist diagnosed her with osteoporosis, which plaintiff claims was a result of the chemotherapy she underwent for breast cancer. The oncologist prescribed four medications to treat plaintiff's osteoporosis: Fosamax, Calcium, Vitamin D, and Vitamin E. In addition, plaintiff suffers from hyperthyroidism and was prescribed Levoxyl for that condition. Plaintiff was also prescribed Naproxin for severe migraine headaches. Plaintiff alleges that despite her numerous requests, and despite the filing of several grievances, the prescriptions were either not filled at all or were not filled in a timely manner, causing her joint pain, undue suffering, and other physical damage.

Plaintiff alleges in count five of the amended complaint that Sawhney failed to provide her with necessary mammograms in a timely manner and that when a mammogram was finally performed, they refused to provide her with the results thereof. In count seven, plaintiff alleges that she was improperly denied access to her oncologist and endocrinologist by Sawhney and Bryant, and that she was improperly denied access to a gynecologist by Sawhney.

On July 13, 2005, Judge O'Meara entered an order adopting this court's Report and Recommendation that plaintiff's second amended complaint be dismissed (D/E #81). That dismissal was based on a retroactive application of Jones Bey v. Johnson, 407 F.3d 801 (6th Cir. 2005), in which the Sixth Circuit instructed the district courts that they must completely dismiss all complaints with mixed exhausted and unexhausted claims. Judgment was then entered in favor of the remaining defendants (D/E #82).

- 3 -

Plaintiff subsequently appealed the dismissal of her complaint (D/E #89) and, on June 14, 2007, the Sixth Circuit entered an order vacated the district court's order and remanding this case for further proceedings (D/E #92).  The Sixth Circuit's decision was based on the holding of a United States Supreme Court case decided after plaintiff's case was dismissed, Jones v. Bock, 127 S.Ct. 910 (2007).  In Jones, the Supreme Court held, in the pertinent part, that where a complaint contains both exhausted and unexhausted claims, the district court should proceed with the exhausted claims while dismissing the unexhausted claims, rather than dismissing the complaint in its entirety.  Jones, 127 S.Ct. at 923-925.

On August 24, 2007, plaintiff filed a motion to reinstate Dr. Nichols as a defendant (D/E #100).  In that motion, plaintiff argued that, in light of recent case law, she should be deemed to have exhausted her administrative remedies with respect to her claims against Dr. Nichols and, therefore, he should be reinstated as a defendant.  On September 11, 2007, this court granted plaintiff's motion to reinstate Dr. Nichols as a defendant (D/E #106).

In her previous motion for summary judgment (D/E #117), filed on November 16, 2007, defendant Sawhney argued that she was entitled to summary judgment because plaintiff did not have a serious medical need given the medical evidence demonstrating that plaintiff is free of cancer and other dangerous conditions.  Sawhney also argued that she was not deliberately indifferent to plaintiff's medical needs.  According to Sawhney, there was no evidence that she was aware of plaintiff's complaints or that she cancelled appointments, she provided plaintiff with adequate medical care, and there was no evidence of the requisite subjective intent.  Sawhney further argued that, assuming she did delay plaintiff's treatment, a delay without

- 4 -

further injury does not constitute deliberate indifference and there was no injury caused by any delay in this case.

On February 28, 2008, plaintiff filed a response to Sawhney's motion for summary judgment (D/E #128).

On March 5, 2008, defendants Bryant and Rawlins filed a motion for summary judgment (D/E #128). In that motion, Bryant argued that she was entitled to summary judgment because she was not personally involved with the alleged constitutional violations that occurred in 2002 and plaintiff did not suffer any injuries from the alleged delays in treatment that occurred after 2002. Rawlins argued that she was entitled to summary judgment because there was no evidence supporting plaintiff's claim against Rawlins and plaintiff has no medical documentation to support her claim that she suffered any harm.

On May 6, 2008, plaintiff filed a response to Bryant and Rawlins' motion for summary judgment (D/E #132).

On August 20, 2008, this court issued a report and recommendation finding that defendants' motions should be granted in part (D/E #135). As found by this court, the only claims in which genuine issues of material fact were in dispute were (1) plaintiff's claim arising from Sawhney's alleged failure to remove sutures from plaintiff's left ear and left arm, and (2) plaintiffs' claims against Bryant and Rawlins relating to the treatment for osteopenia.

On August 29, 2008, Bryant and Rawlins filed an objection to this court's report and recommendation (D/E #136). According to that objection, Bryant was entitled to summary judgment and qualified immunity because no reasonable juror would believe that Bryant, an LPN, should have scheduled plaintiff to see Dr. Axelson for osteopenia treatment when three

medical doctors repeatedly said that plaintiff did not need a return visit.  The objection also stated that Rawlins was entitled to summary judgment and qualified immunity because there was no proof of any kind demonstrating that Rawlins was personally involved in the processing or handling of plaintiff's requests for medication re-fills at issue in this case.  Rawlins also attached another affidavit to the objection.

On September 4, 2008, Sawhney filed an objection to this court's report and recommendation (D/E #137).  According to that objection, Sawhney was entitled to summary judgment because there is no evidence that she cancelled any appointments, plaintiff admits that Sawhney eventually called her out for removal of the sutures, and there is no proof of injury from the delay in removal of the sutures.

On September 18, 2008, Judge O'Meara entered an order accepting and adopting this court's report and recommendation (D/E #143).

On September 30, 2009, defendants Bryant and Rawlins filed the instant motion for summary judgment (D/E #201).  Defendants again argue that they are entitled to qualified immunity and that plaintiff has failed to establish an Eighth Amendment claim.

On October 26, 2009, plaintiff filed a response to Bryant and Rawlins' motion for summary judgment (D/E #209).  In that response, plaintiff argues that, as she previously argued in her response to Bryant and Rawlins' objections to this court's report and recommendation, the evidence in this case demonstrates that genuine issues of material fact exist with respect to her claims against Bryant and Rawlins.

On October 1, 2009, defendant Sawhney filed the instant motion for summary judgment (D/E #203).  In that motion, Sawhney again argues that summary judgment should be entered in

her favor because there is no evidence upon which a reasonable juror could conclude that

plaintiff had a serious medical need with respect to her sutures or that Sawhney was deliberately

indifferent to any such need.

On November 4, 2009, plaintiff filed a response to Sawhney's motion for summary

judgment (D/E #210).  In that response, plaintiff argues that there are genuine issues of material

fact in dispute with respect to her claim against Sawhney.

On November 16, 2009, Sawhney filed a reply to plaintiff's response in which she

reiterated her earlier arguments (D/E #213).

**B. Factual Background**

Defendants filed prior motions for summary judgment and they continue to rely on the

evidence submitted in support of those prior motions.  Similarly, rather than reattaching a

number of plaintiff's medical records to her current responses, plaintiff instead incorporated by

reference evidence previously submitted to the court in support of her prior responses to motions

for summary judgment.  As described in this court's earlier report and recommendation, the

evidence submitted by the parties provided:

> Plaintiff has been incarcerated in prison since August 8, 1997.
> (Plaintiff's Deposition, p. 19)[2]  She was housed at SCF from
> August 8, 1997 through August 2, 2005.  On August 2, 2005,
> plaintiff was transferred to the Huron Valley Women's Facility
> (WHV), where she is currently incarcerated.  (Plaintiff's
> Deposition, pp. 19-20)

---

[2]Plaintiff's deposition is attached as Exhibit B to defendant Sawhney's Motion for
Summary Judgment (D/E #117).

- 7 -

Plaintiff has a history of breast cancer.  In 1994, plaintiff was diagnosed with breast cancer and had lumpectomy surgery.  In 1995, plaintiff underwent chemotherapy and radiation.  Since that time, plaintiff's cancer has been in remission.  (Plaintiff's Deposition, p. 97)

Plaintiff underwent mammograms on December 3, 1998 and March 8, 2000.  The findings of both of those mammograms were benign.  (Reports, attached as part of Appendix IX to Plaintiff's Response to D/E #117)

On October 8, 2001, plaintiff was examined by Dr. John Axelson, an oncologist, and Dr. Axelson found no evidence of anything wrong with plaintiff.  Dr. Axelson did, however, order an MRI of plaintiff's thoracic spine and a total body scan.  (Clinic Consultation, attached as part of Exhibit A to Plaintiff's Response to D/E #117)  The MRI was normal and it displayed no evidence of metastasis.  (MRI Report, attached as part of Exhibit A to Plaintiff's Response to D/E #117)

On November 1, 2001, plaintiff underwent the bone scan ordered by Dr. Axelson and she was subsequently examined by Dr. Malcolm S. Trimble.  According to Dr. Trimble, the bone scan revealed an increased uptake at T8, which was "concerning for metastatic disease."  The bone scan also showed a solitary lesion in plaintiff's mid-thoracic spine.  Dr. Trimble ordered an MRI of plaintiff's T-spine.  (Clinic Consultation, pp. 208, 221, attached as part of Sawhney's Exhibit A)[3]  A December 19, 2001 MRI revealed no bony abnormalities in plaintiff's thoracic spine or spinal cord.  (MRI Report, p. 208 of Sawhney's Exhibit A)

On November 7, 2001, plaintiff had another mammogram.  That mammogram revealed plaintiff's previous lumpectomy and radiation, but no suspicious calcifications or significant abnormalities.  The assessment was benign, pending comparison with previous mammograms.  (Mammography Report, p. 227 of Sawhney's Exhibit A; also attached as part of Appendix VIII to Plaintiff's Response to D/E #117 and as part of Exhibit F to Plaintiff's Response to D/E #128)  On December 19, 2001, that

---

[3]The page numbers of defendant Sawhney's Exhibit A refer to the Bates-stamped page numbers of plaintiff's medical records.

- 8 -

mammogram was compared to previous mammograms and the final assessment was again benign.  (Mammography Report, attached as part of Appendix VIII to Plaintiff's Response to #117 and as part of Exhibit F to Plaintiff's Response to D/E #128)

On January 25, 2002, plaintiff underwent surgery to remove a lesion from her left shoulder and arm.  According to the discharge instructions issued after that surgery, plaintiff's sutures were to be removed on February 3, 2002 at SCF.  (Discharge Instructions dated January 25, 2002, attached as Appendix I to Plaintiff's Response to D/E #117)

On February 14, 2002, plaintiff visited Dr. Axelson for a appointment following up on plaintiff's previous breast cancer. Upon examination, Dr. Axelson found a "right supraclavicular lymph node" that he believed was most likely benign.  However, Dr. Axelson did refer plaintiff to Dr. Gregory Casey for a lymph node biopsy in order to be sure the lymph node was benign. Additionally, after noting that plaintiff was complaining of back pain and that she had an abnormal bone scan,  Dr. Axelson recommended both that plaintiff undergo a bone densitometry study along with thoracic films and that plaintiff start taking the medication Fosamax for osteopenia and osteoporosis prevention. (Clinic Consultation, pp. 208-209 of Sawhney's Exhibit A; also attached as Appendix XIII to Plaintiff's Response to D/E #117 and as part of Exhibit B to plaintiff's response to D/E #128)

Both plaintiff's progress notes and a specialty consult report reflect that plaintiff was to return to the clinic at the Duane Waters Hospital for a follow-up visit with Dr. Axelson in three months. (pp. 83, 142 of Sawhney's Exhibit A; also attached as part of Appendix VI to Plaintiff's Response to D/E #117 and as part of Exhibit B to Plaintiff's Response to D/E #128)  According to her affidavit, inmate Donna Trapani heard Dr. Axelson advise plaintiff of plaintiff's treatment and she saw Dr. Axelson hand a transportation officer a 409 form regarding plaintiff's return visit. (Affidavit of Donna Trapani, attached as part of Attachment A to Plaintiff's Response to D/E #117)  Although plaintiff could not produce any such form, she also recalls seeing a 409 form in her medical file. (Plaintiff's Deposition, pp. 53-54)

On February 21, 2002, plaintiff underwent surgery to excise lesions from her left ear and right arm.  According to the discharge

instructions issued after that surgery, plaintiff's sutures were to be removed on February 23, 2002 at SCF.  (Discharge Instructions dated February 21, 2002, attached as Appendix II to Plaintiff's Response to #117)  According to plaintiff, she personally spoke with Sawhney about Sawhney removing plaintiff's sutures, (Plaintiff's Deposition, p. 102), but Sawhney failed to remove them and plaintiff eventually had another inmate remove the sutures with a pair of scissors, a pair of tweezers, and pink disinfectant.  (Affidavit of Pamela Gordon, D/E #129)

An April 1, 2002 bone density study showed that plaintiff had osteopenia.  (Report, pp. 200-201 of Sawhney's Exhibit A)

On July 9, 2002, Dr. Casey conducted a needle aspiration biopsy on the area of supraclavicular adenopathy.  (Clinic Consultation, pp.188-189 of Sawhney's Exhibit A; Appendix VII to Plaintiff's Response to D/E #117)  That biopsy did not identify any tumor cells and the tissue came back as showing normal lymphoid appearing tissue.  (Progress Notes and Clinic Consultations, pp. 72, 175, 182 of Sawhney's Exhibit A)

On November 12, 2002, Dr. Casey saw plaintiff by "telemed" because, despite the benign findings of plaintiff's tests, plaintiff had stated that the area of her neck where the lymphoid was had increased in size since Dr. Casey last saw her.  Dr. Casey recommended that plaintiff be sent to see him in two weeks, (Clinic Consultation, p. 182 of Sawhney's Exhibit A; also attached as part of Appendix VI to Plaintiff's Response to D/E #117))

On November 26, 2002, Dr. Casey examined plaintiff at the clinic. Dr. Casey found that plaintiff's lymph nodes at the base of the right side of her neck had increased and, therefore, he recommended that plaintiff be taken in for a formal excisional biopsy of at least one of the lymph nodes.  Dr. Casey also stated that, because plaintiff has a history of thyroid disease, he would arrange a consultation with Dr. Qutob, an endocrinologist.  (Clinic Consultation, p. 175 of Sawhney's Exhibit A; also attached as part of Appendix XI to Plaintiff's Response to D/E #117 and as part of Exhibit C to Plaintiff's Response to D/E #128)

CMS approved the biopsy recommended by Dr. Casey (CMS Authorization Request and Response, pp. 30-31, 66 of Sawhney's Exhibit A) and, on January 10, 2003, Dr. Casey performed a

"Supraclavicular exploration of the middle triangle of the neck with no identification of lymphadenopathy." (Operative Report, p. 159 of Sawhney's Exhibit A) That operation did not reveal any evidence of any gross lymphadenopathy. (Operative Report, pp. 159-160 of Sawhney's Exhibit A)

On January 24, 2003, plaintiff completed a Prisoner Medication Re-Order Form requesting refills of Fosamax, Vitamin E, Levoxyl, Vitamin A and Oyster Shell Calcium. (Prisoner Medication Re-Order Form, January 24, 2003, attached as part of Exhibit 6 to Plaintiff's Deposition)[4] On February 2, 2003, plaintiff sent in a Prisoner Medication Re-Order Form requesting refills of Fosamax, Oyster Shell Calcium, Vitamin E and Levoxyl. (Prisoner Medication Re-Order Form, February 2, 2003, attached as part of Exhibit 6 to Plaintiff's Deposition) On February 7, 2003, plaintiff sent in a Prisoner Medication Re-Order Form requesting refills of Oyster Shell Calcium, Fosamax, and Vitamin E. (Prisoner Medication Re-Order Form, February 2, 2003, attached as part of Exhibit 6 to Plaintiff's Deposition) On February 8, 2003, plaintiff sent in a Health Care Request, addressed to Sawhney, requesting that her medications be refilled. In the response, an unidentified person wrote that doctors do not process kites and plaintiff should send in the proper form. (Health Care Request and Response, attached as Exhibit 7 to Plaintiff's Deposition)

On March 3, 2003, plaintiff sent a medical kite, addressed to Bryant, regarding Dr. Axelson's request to see plaintiff within three months of plaintiff's February 14, 2002 examination and Dr. Casey's statement that he would arrange for plaintiff to see an endocrinologist. (Medical Kite, March 4, 2003, attached as Exhibit 1 to Plaintiff's Deposition)

On March 18, 2003, plaintiff met with Sawhney. According to MDOC progress notes, plaintiff wanted to see her oncologist and the endocrinologist recommended by Dr. Casey. Sawhney wrote that plaintiff was very demanding and that he would review plaintiff progress notes and speak with the off site coordinator. (Progress Notes, p. 64 of Sawhney's Exhibit A)

---

[4]The exhibits to plaintiff's deposition are attached as part of Exhibit B to defendant Sawhney's Motion for Summary Judgment (D/E #117).

- 11 -

On May 16, 2003, plaintiff sent in a Prisoner Medication Order
Form requesting refills of Vitamin D, Levoxyl, Naproxen, Vitamin
E, Fosamax and Oyster Shell Calcium. (Prisoner Medication
Order Form, May 16, 2003, attached as part of Exhibit 8 to
Plaintiff's Deposition)

On May 22, 2003, plaintiff again met with Sawhney to complain of
pain in both breasts. While Sawhney did not find any change in
skin color or lymphadenopathy, she ordered a mammogram and
chest x-ray. (Progress Notes, p. 59 of Sawhney's Exhibit A;
Plaintiff's Deposition, p. 129) The chest x-ray was performed that
day and it revealed normal findings and no active pulmonary
disease. (Radiology Request and Report, p. 124 of Sawhney's
Exhibit A)

On June 5, 2003, plaintiff sent in a Prisoner Medication Order
Form requesting refills of Levoxyl, Naproxen, and Vitamin D.
(Prisoner Medication Order Form, June 5, 2003, attached as part of
Exhibit 8 to Plaintiff's Deposition)

On June 9, 2003, the MDOC progress notes for plaintiff provided
that plaintiff kept sending in kites stating that she need to see Dr.
Axelson and Dr. Casey. The progress notes also stated that
Sawhney had reviewed plaintiff's file and found there was no 409
form for a return visit with Dr. Axelson or Dr. Casey. (Progress
Notes, p. 58 of Sawhney's Exhibit A)

On June 12, 2003, plaintiff sent in a Prisoner Medication Re-Order
Form requesting refills of Levoxyl, Naproxen, and Vitamin D.
(Prisoner Medication Re-Order Form, June 12, 2003, attached as
part of Exhibit 9 to Plaintiff's Deposition) On June 13, 2003,
plaintiff sent in a Prisoner Medication Re-Order Form requesting
refills of Oyster Shell Calcium and Fosamax. (Prisoner
Medication Re-Order Form, June 13, 2003, attached as part of
Exhibit 9 to Plaintiff's Deposition) On June 18, 2003, plaintiff
sent in a Prisoner Medication Re-Order Form requesting refills of
Naproxen and Oyster Shell Calcium. (Prisoner Medication Re-
Order Form, June 18, 2003, attached as part of Exhibit 9 to
Plaintiff's Deposition) On June 21, 2003, plaintiff sent in a
Prisoner Medication Re-Order Form requesting a refill of her
Naproxen medication. (Prisoner Medication Re-Order Form, June
21, 2003, attached as part of Exhibit 9 to Plaintiff's Deposition)

On June 28, 2003, plaintiff sent in a Prisoner Medication Order Form requesting a refill of her Naproxen medication. (Prisoner Medication Order Form, June 28, 2003, attached as part of Exhibit 9 to Plaintiff's Deposition)

According to plaintiff, she was scheduled to undergo a mammogram on July 1, 2003, but the mammogram was scheduled for the wrong location and, therefore, not done. (Plaintiff's Deposition, pp. 48-49)

On July 8, 2003, plaintiff visited with Sawhney and, according to Sawhney's notes, demanded a fan, a chest x-ray report and a bone density test. Sawhney also noted that she reviewed plaintiff's file and there was no need for repeat tests. Sawhney further noted that she had seen plaintiff around the prison and plaintiff did not appear to have any pain. (Progress Notes, p. 56 of Sawhney's Exhibit A)

On July 24, 2003, CMS authorized a diagnostic mammogram. (CMS Authorization Request, p. 28 of Sawhney's Exhibit A) On July 25, 2003, plaintiff was examined by Dr. Sati Nichols. While plaintiff complained of pain in her right breast, Dr. Nichols did not find anything abnormal. Dr. Nichols did note that Sawhney had already ordered a mammogram. (Progress Notes, p. 55 of Sawhney's Exhibit A)

On August 8, 2003, plaintiff again visited with Sawhney and complained that she needed to see Dr. Axelson and have a bone density scan. (Progress Notes, p. 54 of Sawhney's Exhibit A)

On August 19, 2003, plaintiff sent a Health Care Request, addressed to Bryant, requesting that a mammogram be scheduled. In a response dated August 22, 2003, an unidentified person wrote that Sawhney had already requested that a mammogram be performed, but because it had to be performed off-site, CMS approval was needed. The response also stated that Bryant would check on the "hold-up" in getting CMS approval. (Health Care Request and Response, attached as Exhibit 2 to Plaintiff's Deposition)

On September 8, 2003, plaintiff sent another Health Care Request addressed to Bryant. In that request, plaintiff stated that the pain in her breast had increased since her previous request and she needed

- 13 -

a mammogram.  (Health Care Request, attached as Exhibit 3 to
Plaintiff's Deposition)

On September 9, 2003, plaintiff underwent a bilateral diagnostic
mammogram.  The radiology report from that date found the
presence of a few benign-appearing calcifications.  There were no
suspicious cluster of microcalcifications.  (Radiology Report, p.
156 of Sawhney's Exhibit A; also attached as part of Appendix IX
to Plaintiff's Response to D/E #117)  That report was also
compared with previous mammograms and it was determined that
the calcifications were stable.  It was also recommended that a
follow-up mammogram be made in one year.  (Radiology Report,
p. 157 of Sawhney's Exhibit A; also attached as part of Appendix
IX to Plaintiff's Response to D/E #117)

On April 27, 2004, plaintiff visited Sawhney and complained about
an enlarged lymph node on the right side of her neck, a sore throat
and pain in her hip.  Sawhney found a dime sized lump, prescribed
medication and ordered an x-ray of plaintiff's hip.  (Progress
Notes, p. 47 of Sawhney's Exhibit A; Plaintiff's Deposition, p.
151)

On May 1, 2004, CMS approved a needle biopsy of the right side
of plaintiff's neck.  (CMS Authorization Request, p. 18 of
Sawhney's Exhibit A)

On May 11, 2004, plaintiff again visited Sawhney stating that she
needed to see an oncologist and complaining about the lump on her
neck.  In response, Sawhney noted that there was no
documentation providing for a visit to an oncologist and that
plaintiff's last visit to an oncologist had been in February of 2002.
Sawhney also noted that she would refer plaintiff for a biopsy.
(Progress Notes, p. 45 of Sawhney's Exhibit A)

On June 6, 2004, CMS again approved a biopsy of the right side of
plaintiff's neck.  (CMS Authorization Request, p. 14 of Sawhney's
Exhibit A)  The right cervical neck lymph node biopsy was
performed on July 14, 2004 and it showed no evidence of
lymphoma or other malignancy.  (Progress Notes and Surgical
Pathology Report, pp. 40, 113 of Sawhney's Exhibit A)

On June 24, 2004, plaintiff sent a memo, addressed to Ms. Butler,
plaintiff's health care manager, requesting a meeting to discuss

- 14 -

plaintiff's ongoing health concerns.  On July 15, 2004, Butler
requested a statement of plaintiff's concerns so that Butler could
be aware of plaintiff's issues prior to meeting with plaintiff.
(Memo and Response, attached as Exhibit 5 to Plaintiff's
Deposition)

On July 19, 2004, Nurse Nichols examined plaintiff after plaintiff
complained of bilateral nipple discharge, but plaintiff was unable
to describe the frequency or onset of the claimed discharge.  Nurse
Nichols found no discharge from the right nipple and only pinhead
size discharge from the left.  Nurse Nichols told plaintiff she
would request a referral for plaintiff.  (Progress Notes, p. 42 of
Sawhney's Exhibit A)  A request for a referral to evaluate the
discharge was made that same day and, on July 21, 2004, CMS
approved a diagnostic mammogram.  (CMS Authorization
Request, pp. 8, 11 of Sawhney's Exhibit A)  That mammogram
was conducted on August 4, 2004 and it revealed no radiographic
evidence of malignancy in the left breast.  (Report, p. 150 of
Sawhney's Exhibit A; also attached as part of Exhibit A to
Plaintiff's Response to D/E #117)

On August 19, 2004, plaintiff met with a Health Unit Manager to
discuss her numerous concerns, including plaintiff's concerns
regarding her visits to specialists and her medications.  The Health
Unit Manager said she would speak to Sawhney at the next
possible date.  (Progress Notes, p. 39 of Sawhney's Exhibit A)

On August 20, 2004, a request was made for a consult with Dr.
Axelson (CMS Authorization Request, p. 5 of Sawhney's Exhibit
A; also attached as part of Appendix VI to Plaintiff's Response to
D/E #117), but plaintiff's progress notes provide that, on
September 27, 2004, Dr. David Prough's office was called about
the consult and Dr. Prough's nurse said that Dr. Prough had said
there was no need for plaintiff to see Dr. Axelson because all of
plaintiff's tests were negative (Progress Notes, p. 39 of Sawhney's
Exhibit A).  Plaintiff's progress notes for September 28, 2004
indicate that, while Dr. Prough wrote an order sheet stating that
plaintiff should be seen by Dr. Axelson, he did not mention such a
visit in the 409 report.  The progress notes for that date also
indicate the need for a decision  (Progress Notes, p. 38 of
Sawhney's Exhibit A)

- 15 -

The progress notes for October 7, 2004 indicate that Dr. Prough
called Sawhney and discussed plaintiff's health.  Sawhney asked
for the reason to send plaintiff to see Dr. Axelson and Dr. Prough
responded that, while there was no such reason, plaintiff insisted
that she be seen by an oncologist.  Sawhney then requested a
follow-up statement from Dr. Prough.  (Progress Notes, p. 37 of
Sawhney's Exhibit A)  Dr. Prough wrote the follow-up statement
that day.  In a letter to Sawhney, Dr. Prough wrote that, while in
his opinion everything was fine, plaintiff has apparently been
complaining to Sawhney about the possibility of her having
malignancy.  Dr. Prough also wrote that he did not recall ordering
a referral to Dr. Axelson and that, if he did, it was only in reaction
to plaintiff's persistence and hysteria. Dr. Prough further wrote
that, given plaintiff's persistent concerns, plaintiff may benefit
from a visit to Dr. Axelson and hearing that she was fine directly
from him.  (Letter, pp. 147-148 of Sawhney's Exhibit A)

On October 14, 2004, plaintiff and Sawhney spoke about
plaintiff's health.  (Progress Notes, p. 36 of Sawhney's Exhibit A)
At that meeting, plaintiff acknowledged that Dr. Prough had stated
she did not need a referral to see Dr. Axelson.  (Plaintiff's
Deposition, p. 114)

On January 20, 2005, plaintiff was examined by Dr. Nichols, who
referred plaintiff's specific questions regarding osteoporosis and
her thyroid to the medical service provider at the chronic care.
(Progress Notes, p. 649 of Sawhney's Exhibit A)

On March 3, 2005, the Garcia Laboratory issued a report regarding
plaintiff that included a finding that plaintiff's cholesterol was 314
mg/dl.  According to that report, "high" cholesterol is greater than
or equal to 240 mg/dl.  (Garcia Laboratory Report, March 3, 2005,
attached as Appendix V to Plaintiff's Response to D/E #117)

On March 4, 2005, plaintiff requested a mammogram.  Plaintiff
also asked about why she had not been referred to Dr. Axelson for
her osteoporosis and whoever wrote the progress notes responded
that there was no need for a referral because plaintiff was already
receiving the necessary treatment.  (Progress Notes, p. 646 of
Sawhney's Exhibit A)

On April 20, 2005, plaintiff was again informed that her
osteoporosis would be treated by her medical service provided and

- 16 -

not by her oncologist.  Plaintiff was also informed that her mammogram was pending.  (Progress Notes, p. 357 of Sawhney's Exhibit A)

On May 12, 2005, plaintiff underwent a bilateral diagnostic mammogram.  The results of that mammogram were normal. (Letter, p. 422 of Sawhney's Exhibit A; also attached as part of Exhibit A to Plaintiff's Response to D/E #117)

On August 31, 2005, Dr. Nichols wrote that he had reviewed plaintiff's records and, while plaintiff continued to have complaints and concerns, she is receiving the appropriate medical care and does not need to see any outside specialists.  Dr. Nichols also recommended that plaintiff receive annual mammograms. (Progress Notes, p. 347 of Sawhney's Exhibit A)

On May 12, 2006, plaintiff underwent a bilateral diagnostic mammogram.  There was no evidence of malignancy in either breast and all findings were benign.  (Report, pp. 482-483 of Sawhney's Exhibit A)  On June 6, 2006, another breast exam was done and there were no changes in plaintiff's condition.  (Progress Notes, p. 330 of Sawhney's Exhibit A)

On January 22, 2007, plaintiff underwent a whole body scan.  That scan revealed an "Abnormal increased concentration of radioactivity in the junction of body and manubrium sterni, and in the multiple (3) mid dorsal vertebrae, most likely due to metastasis" and "Abnormal uptake in the bilateral tibial shafts, most likely due to shin splints.  Posterior arthopathy is less likely as a possibility.  Clinical correlation of the plain radiographs of both tibias and fibulas is suggested for further evaluation."  No other areas of abnormal changes in concentration of radioactivity were seen in plaintiff's skeleton.  (Report, attached as part of Appendix X to Plaintiff's Response to D/E #117 and as Exhibit H to Plaintiff's Response to D/E #128)[5]

On January 23, 2007, an x-ray of plaintiff's thoracic spine demonstrated no evidence of any significant changed and minimal degenerative disk disease changes.  (Radiology Report, p. 533 of Sawhney's Exhibit A)  An x-ray of plaintiff's cervical spine taken

---

[5]Part of that report is also attached as p. 418 of Sawhney's Exhibit A.

- 17 -

on the same day was also negative.  (Radiology Report, p. 534 of
Sawhney's Exhibit A)

On March 6, 2007, plaintiff underwent an MRI of her thoracic
spine.  That MRI revealed no evidence of metastatic lesion or
osseous fracture (Report, p. 411 of Sawhney's Exhibit A; also
attached as part of Appendix X to Plaintiff's Response to D/E
#117) while further x-rays showed mild degenerative changes of
the mid thoracic spine and no evidence of metastatic disease to
bone (Report, p. 412; also attached as part of Appendix X to
Plaintiff's Response to D/E #117).

On June 6, 2007, plaintiff underwent a bilateral diagnostic
mammogram.  That mammogram revealed no radiographic
evidence of malignancy.  (Radiology Report, pp. 408-409 of
Sawhney's Exhibit A; also attached as part of Exhibit A to
Plaintiff's Response to D/E #117)

[August 20, 2008 Report and Recommendation, pp. 2-15 (footnotes in original)]

## III. Standard of Review

Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure

56(b), which states that "[a] party against whom a claim, counterclaim, or cross-claim is asserted

or a declaratory judgment is sought may, at any time, move without or without supporting

affidavits for a summary judgment in the party's favor as to all or any part thereof."  Summary

judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R.

Civ. P. 56(c).

In deciding a motion for summary judgment, the court must view the evidence and draw

all reasonable inferences in favor of the non-movant.  See Matsushita Electric Industrial Co.,

Ltd. et al. v. Zenith Radio Corp., et. al., 475 U.S. 547, 587, 106 S.Ct. 1348, 1356 (1986); see also

B.F. Goodrich Co. v. U.S. Filter Corp., 245 F.3d 587, 591-92 (6th Cir. 2001).  The moving party

bears the initial burden of demonstrating the absence of a genuine issue of material fact.  Once

the moving party has carried his burden, the party opposing the motion "must come forward with

specific facts showing that there is a genuine issue for trial."  <u>Matsushita</u>, 475 U.S. at 587, 106

S.Ct. 1348.  The opposing party cannot merely rest upon the allegations contained in his

pleadings.  Rather, he must submit evidence demonstrating that material issues of fact exist.

<u>Banks v. Wolfe County Bd. of Educ.</u>, 330 F.3d 888, 892 (6th Cir. 2003); Fed. R. Civ. P. 56(e).

"Where the record taken as a whole could not lead a rational trier of <u>fact </u>to find for the non-

moving party, there is no 'genuine issue for trial.'"  <u>Matsushita</u>, 475 U.S. at 587, 106 S.Ct. 1348

(<u>quoting</u> <u>First National Bank of Arizona v. Cities Service Co.</u>, 391 U.S. 253, 289, 88 S.Ct. 1575,

1592 (1968)).[6]

## IV.  Discussion

This court recommends that both of defendants' motions be denied pursuant to the law of

the case doctrine.  Under the law of the case doctrine, "when a court decides upon a rule of law,

that decision should continue to govern the same issues in subsequent stages in the same case."

<u>Westside Mothers v. Olszewski</u>, 454 F.3d 532, 538 (6th Cir. 2006).  Likewise, "findings made at

---

[6]Bryant and Rawlins also argue that they are entitled to qualified immunity because there was no constitutional violation.  Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation."  <u>Saucier v. Katz</u>, 533 U.S. 194, 200; 121 S.Ct. 2151; 150 L.Ed.2d 272 (2001), quoting <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).  However, a "court should not grant summary judgment on the issue of qualified immunity if there exists a genuine issue of material fact, 'involving an issue on which the question of immunity turns'" such as whether there was a constitutional violation, <u>Flint ex rel. Flint v. Kentucky Dept. of Corrections</u>, 270 F.3d 340, 346-347 (6th Cir. 2001) quoting <u>Poe v. Haydon</u>, 853 F.2d 418, 425-426 (6th Cir. 1988), and, therefore, there is no need for a separate qualified immunity analysis in this case.

one point in the litigation become the law of the case for subsequent stages of that same litigation." United States v. Moored, 38 F.3d 1419, 1421 (6th Cir. 1994).

Here, Bryant previously argued in both her earlier motion for summary judgment and her objection to this court's report and recommendation that no genuine issue of material fact was in dispute with respect to whether she should have scheduled plaintiff's appointment with Dr. Axelson. Bryant's arguments were subsequently rejected by Judge O'Meara. Similarly, Rawlins' argument, found in both her earlier motion for summary judgment and the objection to this court's report and recommendation, that she is entitled to summary judgment because she was not personally involved in processing plaintiff's medication requests was also previously rejected by Judge O'Meara. Furthermore, Sawhney again argues, like she did in her motion and her objection to this court's report and recommendation, that there is no proof that plaintiff had a serious medical need or that Sawhney was deliberately indifferent to any serious medical need, but Judge O'Meara has previously ruled that a genuine issue of material fact exists with respect to those issues.

Judge O'Meara has previously ruled on and rejected the arguments found in defendants' current motions for summary judgment. That decision should continue to govern the same issues in the subsequent stages in the same case and, consequently, defendants' motions for summary judgment should be denied pursuant to the law of the case doctrine. See Westside Mothers, 454 F.3d at 538. See also 35B C.J.S. Federal Civil Procedure 1223 (stating that a decision on a defendant's motion for summary judgment constitutes the law of the case and the same questions may not be raised by the filing of a second motion for summary judgment).

The law of the case doctrine does not preclude reconsideration of a previously decided issue if one of three "exceptional circumstances" exists: "(1) where substantially different evidence is raised on subsequent trial; (2) where a subsequent contrary view of the law is decided by the controlling authority; or (3) where a decision is clearly erroneous and would work a manifest injustice." Westside Mothers, 454 F.3d at 538 (citing Hanover Ins. Co. v. Am. Eng'g Co., 105 F.3d 306, 312 (6th Cir.1997)). However, defendants do not argue that any of these exceptions apply and, instead, they simply make the same, previously-rejected arguments they made before. In light of the previous filings and decisions in this case, as well as the absence of any exceptional circumstances allowing reconsideration of a previously decided issue, this court finds that the law of the case doctrine applies and that defendants' motions for summary judgment should be denied.

**V. Conclusion**

For the reasons discussed above, the court recommends that defendants' motions be **DENIED** pursuant to the law of the case doctrine.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. Thomas v. Arn, 474 U.S. 140 (1985); Howard v. Secretary of HHS, 932 F.2d 505, 508 (6th Cir. 1991); United States v.

<u>Walters</u>, 638 F.2d 947, 949-50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  <u>Willis v. Secretary of HHS</u>, 931 F.2d 390, 401 (6th Cir. 1991); <u>Smith v. Detroit Fed'n of Teachers Local 231</u>, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court.  The response shall address each issue contained within the objections specifically and in the same order raised.

<u>S/Virginia M. Morgan</u>
Virginia M. Morgan
United States Magistrate Judge

Dated: December 3, 2009

---

## PROOF OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and plaintiff via the Court's ECF System and/or U. S. Mail on December 3, 2009.

<u>s/J. Johnson</u>
Case Manager to
Magistrate Judge Virginia M. Morgan