UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMIRA SALEM #258302,

        Plaintiff,

v.

JOAN N. YUKINS, *et al.*,

        Defendants.

Case No: 04-72250

Magistrate Judge Laurie J. Michelson

_____/

## OPINION AND ORDER ON PLAINTIFF'S MOTION FOR SANCTIONS [271]

This matter is before the Court on Plaintiff Amira Salem's ("Plaintiff") Motion for Sanctions and for Issuance of a Preliminary Injunction ("Motion for Sanctions"). (Dkt. 271.)

Plaintiff's motion arises out of a civil rights dispute, brought under 42 U.S.C. § 1983, that the parties appeared to settle in January 2011. Plaintiff, a former inmate at the Robert Scott Correctional Facility ("SCF") in Plymouth, Michigan, alleged that several prison administrators, doctors, and nurses, were deliberately indifferent to her medical needs on numerous occasions in violation of her Eighth Amendment rights. Following dispositive motions, and as the trial date approached, Plaintiff entered into a Settlement Agreement with the two remaining Defendants, Juanita Bryant and Antonia Rollins ("Defendants"). Under the Settlement Agreement, the Michigan Department of Corrections ("MDOC"), on behalf of Bryant and Rollins, "agree[d] to refer Plaintiff to an oncologist affiliated with the University of Michigan Health System for an evaluation of Ms. Salem's health conditions arising out of her breast cancer treatment and history, including but not limited to osteoporosis." The word "evaluation," however, has proven to be a point of ongoing dispute.

Indeed, on August 20, 2012, upon Plaintiff's Motion to Enforce the Settlement Agreement,

the Court found that MDOC had not complied with this provision of the Settlement Agreement: "[w]hile [an ongologist] did an 'evaluation,' . . . it did not 'includ[e]' Plaintiff's osteoporosis." (Dkt. 270.)[1] The Court therefore ordered MDOC to refer Plaintiff to an oncologist for an evaluation of her osteoporosis. (*Id*.)

In her now-pending Motion for Sanctions, Plaintiff claims that MDOC failed to comply with the Court's August 20, 2012 Order. (Dkt. 271.) MDOC filed a response on January 28, 2013 (Dkt. 272) and a supplemental brief on March 12, 2013 (Dkt. 276), and Plaintiff filed a supplemental affidavit with attachments on March 13, 2013 (Dkt. 277.) That same day (March 13, 2013), the Court heard oral argument. Following oral argument, MDOC submitted another supplemental brief. (Dkt. 278.) All the briefs have been reviewed, and, for the reasons set forth below, the Motion for Sanctions is DENIED.

## I. BACKGROUND

The facts of this case have been thoroughly recounted in several prior district court and Sixth Circuit opinions, as well as this Court's August 20, 2012 Order. Thus, the Court will focus on the procedural history resulting in the present Motion for Sanctions.

### A. Plaintiff's Initial Motion to Enforce the Settlement Agreement

Plaintiff is a breast cancer survivor. She was diagnosed in 1994 and had lumpectomy surgery. (Dkt. 215, 12/03/09 Report and Recommendation on Mot. for Summ. J. of Bryant and Rawlins). She underwent chemotherapy and radiation in 1995. (*Id*.) Subsequently, the cancer was in remission. (*Id*.)

Plaintiff has been incarcerated since August 8, 1997 and has been seen and treated by many

---

[1] The parties consented to have the case referred to a Magistrate Judge. (Dkt. 245.)

doctors. (*Id*. at 7-18.) Plaintiff was not satisfied with her treatment and filed this lawsuit on June 29, 2004, alleging that sixteen prison officials were deliberately indifferent to her medical needs in violation of her Eighth Amendment rights. (Dkt. 3.) She subsequently filed an Amended Complaint on January 5, 2005 which reduced the claims and Defendants. (Dkt. 50.)

After many years of litigation, the parties entered into a Settlement Agreement on January 13, 2011 that provides as follows:

> The Michigan Department of Corrections, on behalf of the MDOC Defendants, by and through its Chief Medical Officer further agrees to refer Plaintiff to an oncologist affiliated with the University of Michigan Health System for an evaluation of Ms. Salem's health conditions arising out of her breast cancer treatment and history, including but not limited to osteoporosis. The referral will be made within one month of Defendants' counsel being provided a signed copy of this agreement. The appointment will be scheduled as soon as practicable, contingent on the oncologist's schedule. The MDOC further agrees to provide medical documents requested by the oncologist, to transport Plaintiff with any additional medical records that she designated, and to follow the recommendations, if any, of the oncologist that result from the referral and that are consistent with national standards of care and evidence based medicine.

(Dkt. 260, MDOC Resp. to Mot. Enforce J., Ex. 1).

Pursuant to this provision, on March 15, 2011, Plaintiff was seen by Dr. Tara Breslin ("Dr. Breslin"), Assistant Professor of Surgery, Division of Surgical Oncology, at the Breast Center in the Comprehensive Cancer Clinic at the University of Michigan. (Dkt. 256, Mot. Enforce J., Ex. 1 at ¶ 25.) Dr. Breslin reviewed mammogram and ultra sound results performed on January 1, 2011 and examined Plaintiff's breasts and lymph nodes. She recommended a follow-up ultrasound in 3 months, as well as a clinic visit to address any findings, and a follow-up mammogram in 6 months. (Mot. to Enforce, Ex. 5.) Her treatment notes confirmed that Plaintiff asked about her osteoporosis. (*Id*.) The notes further confirmed that Dr. Breslin's response was that this issue should be managed

in the primary care setting. (*Id*.)

On April 19, 2012, Plaintiff brought a Motion to Enforce the Settlement Agreement. (Dkt. 256.) Plaintiff argued that she "specifically bargained for the settlement agreement to include the language 'an evaluation of Ms. Salem's health conditions arising out of her breast cancer treatment and history, including but not limited to osteoporosis,' because obtaining treatment for [her] osteoporosis was of grave concern to her" and that MDOC failed to comply with this term. (*Id*. at ¶¶ 9-10.) In ruling on the motion, the Court explained that the fundamental issue raised was whether Dr. Breslin "evaluat[ed] Ms. Salem's health conditions arising out of her breast cancer treatment and history, including but not limited to osteoporosis." (Dkt. 270 at 9.) The Court found that "[w]hile Dr. Breslin did an 'evaluation,' . . . it did not 'includ[e]' Plaintiff's osteoporosis." (*Id*.) Thus, the Court ordered:

> within sixty (60) days from the date of this Order, MDOC is to refer Plaintiff to an oncologist affiliated with the University of Michigan for an evaluation of her osteoporosis. Pursuant to the terms of the Settlement Agreement, MDOC shall provide any medical documents requested by the oncologist, transport Plaintiff with any additional medical records that are designated, and follow the recommendations, if any, of the oncologist that result from the referral and that are consistent with national standards of care and evidence-based medicine. This includes any recommendations regarding medications for Plaintiff's osteoporosis.

(*Id*. at 12.)

### B. Plaintiff's Second Motion Alleging Failure to Comply with the Settlement Agreement

Shortly after the Court's ruling, on August 31, 2012, MDOC requested a referral for Plaintiff to "U of M oncology" for "breast cancer follow-up." (Dkt. 272, MDOC Resp. at Ex. 1.) The referral form indicates that this is a "court ordered appointment" and directs that Plaintiff be sent

4

with her DEXA scan results and June 2012 mammogram and ultrasound results. (*Id*.) Plaintiff was sent to the University of Michigan in September 2012 for this visit, but was told it was too soon. (*Id.* at Ex. 3.) It appears that Dr. Breslin wanted to get another mammogram and ultrasound and thus, the appointment was scheduled for December 11, 2012. (*Id.* at Exs. 3, 4) On that date, Plaintiff was seen by Nurse Practitioner (NP) Suzanne Post and Dr. Breslin. (Mot. Sanctions at ¶ 10; MDOC Resp. at 2.)

The visit was summarized in a progress note by NP Post. (MDOC Resp. at Ex. 5.) The note first explains that Plaintiff "presents to the Breast Clinic for follow-up." (*Id*.) "She returns today having had bilateral mammogram and a follow-up right axillary ultrasound." (*Id*.) The progress note references the results of those tests and then summarizes Plaintiff's medical and surgical history, family history, and physical exam results. (*Id*.) The note specifically provides, "[Plaintiff] states that she has headaches and she also has some concerns about osteopenia. Review of written report of an outside bone DEXA scan done in May 2011 showed normal bone density." (*Id*.) The progress note concludes:

> In summary, [Plaintiff] has normal clinical breast exam and normal imaging. Remote history of right breast cancer dating back to approximately 1994. At this point, she should continue to have annual clinical breast exams with a primary provider and annual breast and annual mammograms. She should also have a primary provider to follow up on her other health concerns.
>
> Referrals were put into our system for an appointment in General Medicine and mammogram in one year. It will be up to the prison whether or not these appointments are scheduled here or elsewhere.
>
> She will return to the Breast Clinic on an as needed basis.
>
> We did put in a referral to our General High-Risk Clinic based upon her personal and family history. Again, it will be up to whether or not the system will cover such an appointment.

5

(*Id.*)  This progress note summary is consistent with Dr. Breslin's follow-up care notes.  (MDOC Resp. at Ex. 6.)

It appears that Plaintiff's counsel was unable to obtain copies of the medical records pertaining to Plaintiff's appointment with Dr. Breslin.  Thus, on January 7, 2013, Plaintiff filed the pending Motion for Sanctions, contending that MDOC failed to comply with the Court's August 20, 2012 Order.  (Dkt. 271, Mot. Sanctions.)  According to Plaintiff, the osteoporosis evaluation was not scheduled within the 60 day time-frame.  (*Id.* at ¶ 6.)  Thus, says Plaintiff, her counsel spent considerable time and effort to try to locate a University of Michigan oncologist who could consult and treat Plaintiff for osteoporosis related issues.  (*Id.*)  Plaintiff also complains that an MDOC correction officer did not allow her to stay long enough at her December 2012 appointment with Dr. Breslin for Dr. Breslin to refer her to a University of Michigan oncologist for her osteopenia and overall post-cancer health.  (*Id.* at ¶ 11-12.)  Based on these allegations, Plaintiff seeks monetary sanctions for Defendants' failure to abide by the Court's August 20, 2012 Order and a preliminary injunction directing Plaintiff to be evaluated by certain oncologists at the University of Michigan for her "post cancer health, including osteoporosis related matters."  (*Id.* at ¶ 15.)

Defendants oppose the motion.  (Dkt. 272.)  They contend that they have discharged their burden under the settlement agreement to have Plaintiff's osteopenia/osteoporosis evaluated.  They rely on NP Post's progress note which they interpret as demonstrating that Plaintiff's DEXA scan was reviewed at the oncology appointment.  According to Defendants, this is the test used to evaluate osteoporosis and osteopenia.  (MDOC Resp. at 2-3.)

6

## II. ANALYSIS

### A. Legal Standard

Neither party's brief provides the Court with any law for evaluating whether sanctions are appropriate in this matter. Plaintiff contends that Defendants failed to abide by a court order directing enforcement of the settlement agreement. In seeking sanctions and a preliminary injunction, Plaintiff's brief simply refers, without analysis or application, to Federal Rules of Civil Procedure 65 and 70. Plaintiff provides no explanation as to why a *preliminary* injunction would be appropriate at this stage of the case. Additionally, Rule 70 pertains to enforcing *judgments* for a specific act, which is equally inapplicable here.

The Court recognizes, however, that it has the inherent authority to issue sanctions upon a finding of bad faith. As the Sixth Circuit has explained:

> A district court has the inherent power to sanction a party when that party exhibits bad faith, including the party's refusal to comply with the court's orders. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-50, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991); *Youn v. Track, Inc.*, 324 F.3d 409, 420 (6th Cir. 2003). The "imposition of inherent power sanctions requires a finding of bad faith," *First Bank of Marietta*, 307 F.3d at 517, or conduct "tantamount to bad faith." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767, 100 S. Ct. 2455, 65 L. Ed. 2d 488 (1980) . . . . Nevertheless, a court must exercise caution in invoking its inherent power and comply with the mandates of due process. *Id.* at 50. A court's reliance upon its inherent authority to sanction derives from its equitable power to control the litigants before it and to guarantee the integrity of the court and its proceedings. *Id.* at 43.

*Dell, Inc. v. Elles*, No. 07-2082, 2008 U.S. App. LEXIS 27866, at *5-6 (6th Cir. June 10, 2008). Civil contempt sanctions are likewise "designed to compel future compliance with a court order." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994). "In order to justify a contempt finding, the movant 'must prove by clear and convincing evidence that the party to be

7

held in contempt violated a court order.'" *A&H Mgmt. Servs. v. Chafflose Corp.*, No. 10-3661, 2010 U.S. App. LEXIS 27436, at * 4 (6th Cir. Aug. 26, 2010) (quoting *United States v. Conces*, 507 F.3d 1028, 1041-42 (6th Cir. 2007)).

### B. Defendants' Conduct Is Not Sanctionable

The records provided by MDOC demonstrate that they attempted to "refer Plaintiff to an oncologist affiliated with the University of Michigan for an evaluation of her osteoporosis" within 60 days of the Court's August 20, 2012 Order. Indeed, MDOC made the initial request for an appointment on August 31, 2012. (MDOC Resp. at Ex. 1.) A subsequent referral form (for an ultrasound and mammogram) explains,

> [Plaintiff] was sent for this service in Sept. 2012 and was told it was too soon. Dr. Breslin, U of M surgical oncology, said she needs a ultrasound, mammogram, and f/u visit in December. This request is for the Oncology follow up.

(MDOC Resp. at Ex. 3.) Thus, MDOC's referral of Plaintiff to Dr. Breslin complied with the Court's deadline. The fact that Dr. Breslin wanted additional testing to be done before she examined Plaintiff and thus moved the appointment to December 11, 2012, does not indicate any bad faith or other blameworthy conduct by MDOC.

The record also supports that MDOC referred Plaintiff to Dr. Breslin for an "evaluation" of Plaintiff's osteoporosis. MDOC provides an affidavit from Dr. Jeffrey C. Stieve, its Chief Medical Officer. (*Id.* at Ex. 2.) Dr. Stieve explains that

> evaluation of osteopenia or osteoporosis is done by measuring bone density. Currently, the most widely used technique for measuring bone density is DEXA (Dual Energy Xray Absorptiometry). Osteopenia is a bone density between one standard deviation and 2.5 standard deviations below average for young people. Osteoporosis is a bone density lower than 2.5 standard deviations.

(*Id*. at ¶ 4.) Plaintiff does not provide any alternative means of evaluating osteoporosis. On August 28, 2012, Dr. Stieve contacted the Health Services staff at Plaintiff's correctional facility to advise them of the Court's August 20, 2012 Order and "the need to have Plaintiff's bone density scan reviewed by the U of M Oncologist." (*Id*. at ¶ 6.) MDOC's August 31, 2012 referral form then directs that Plaintiff be sent to the appointment with her DEXA (bone density) scan results. NP Post's progress note of the appointment states that "[r]eview of written report of an outside bone density scan done in May 2011 showed normal bone density." (MDOC Resp. at Ex. 6.) Additionally, the scan was taken after the parties executed the Settlement Agreement. Thus, the bone density scan – a proper means for "evaluat[ing]" osteoporosis and taken for that purpose – was reviewed at Plaintiff's oncology appointment.

Remaining is whether the review was by "an oncologist" affiliated with the University of Michigan Health System. Standing alone, the Progress Note attached to MDOC's response is unclear as to whether the DEXA scan was reviewed by NP Post or the oncologist, Dr. Breslin. This ambiguity has since been resolved.

First, a more complete record suggests that there was a review by Dr. Breslin. Prior to the hearing on the motion for sanctions, the Court had a telephonic status conference with the parties and requested that testimony be provided on this issue by NP Post and/or Dr. Breslin, either by way of written affidavit prior to the hearing or live testimony at the hearing. Neither side presented any such testimony. Instead, the day before the March 13, 2013 hearing, MDOC filed a supplemental brief simply indicating that "there is nothing in the [progress] note . . .that establishes that the oncologist did not review the DEXA scan at Plaintiff's visit" and, in any event, it is Plaintiff's burden to establish the oncologist did not do the review. (Dkt. 276, MDOC Supp. at 2.) Plaintiff

9

then filed an affidavit attaching a more complete version of NP Post's Progress Note. (Dkt. 277, Ex. 2.) It appears that Dr. Breslin signed the Progress Note after adding the following conclusion: "I saw and evaluated this patient. My impression is that the patient has no evidence of local or regional breast cancer recurrence and my plan is for her to continue surveillance in the primary care setting. I agree with the note above, which I have reviewed and edited where appropriate." (Dkt. 277, Ex. 2, Pg ID 5064, 5067.) The note above includes the following statement from NP Post: "Review of written report of an outside bone DEXA scan done in May 2011 showed normal bone density." Dr. Breslin's statement thus suggests to the Court that she evaluated the DEXA scan. That would be the only way she could "agree with the note" and its conclusion that the DEXA scan showed normal bone density.[2]

Second, after the hearing, MDOC sent Plaintiff's DEXA scan to another University of Michigan oncologist to review and evaluate. (*Id.*) On April 2, 2013, Dr. N. Lynn Henry, an assistant professor with the University of Michigan Hospital and Health Systems, Division of Hematology/Oncology, prepared a letter report advising:

> I was asked, as a medical oncologist, by the court to review Ms. Salem's DEXA scan result that was previously performed here at the University of Michigan on May 13, 2011. I was provided with a copy of the original report. I have reviewed the DEXA scan report, and conclude that based on the data provided in the report she has normal bone density at the hip and the spine on May 13, 2011. There was no evidence of bone loss in her hip or spine on that date.

---

[2] Because there was some uncertainty on this point at the time of the hearing, MDOC indicated a willingness to consider sending Plaintiff back to Dr. Breslin. After the hearing, however, MDOC learned that Dr. Breslin no longer practices at the University of Michigan Breast/Oncology Care Center and University of Michigan Nurse Practitioner Joanne Armstrong was concerned that giving another in-person appointment to Plaintiff would deprive a current breast cancer patient of that spot on the schedule. (Dkt 278, MDOC Supp. Br. at 1, Ex. 1.)

(*Id.*, Ex. 2.)

At the hearing, Plaintiff's counsel suggested that a review of the May 2011 DEXA scan is an inadequate evaluation of Plaintiff's osteoporosis because it is too old. The Court disagrees. Plaintiff offers no evidence to support that DEXA scans need to be conducted annually or that the May 2011 scan lacks medical significance. Neither Dr. Breslin nor Dr. Henry expressed any concern about the age of the DEXA scan, nor did they recommend any further testing or treatment. Moreover, as noted, the Settlement Agreement requiring an evaluation of Plaintiff's osteoporosis was entered in January 2011 and the scan was taken in May 2011. The parties' intent, therefore, was to evaluate Plaintiff's osteoporosis around the time covered by the May 2011 DEXA scan.

In sum, the record supports MDOC's contention that it "made the referral to the oncologist and transported Plaintiff with the DEXA scan for the express purpose of having the oncologist evaluate Plaintiff's osteoporosis." (*Id*. at 3.) It also suggests that Dr. Breslin reviewed Plaintiff's DEXA scan and found nothing of concern. And even if she did not, Dr. Henry performed this review and opined that, as of the time Plaintiff was seeking to have her osteoporosis evaluated, she had no evidence of bone loss. Thus, in light of MDOC's efforts to have Plaintiff's osteoporosis evaluated by a University of Michigan Oncologist, the Court finds that sanctions are not warranted. The Court agrees with MDOC that it has satisfied its obligations under the parties' Settlement Agreement.

### III. CONCLUSION

Accordingly, for the reasons set forth above, Plaintiff's Motion for Sanctions is **DENIED.**

**IT IS SO ORDERED.**

                                       s/Laurie J. Michelson
                                       Laurie J. Michelson
                                       United States Magistrate Judge

Dated: May 24, 2013

---

### PROOF OF SERVICE

The undersigned certifies that the foregoing document was served upon the parties and/or counsel of record via the Court's ECF System and/or U. S. Mail on May 24, 2013.

                                       s/Jane Johnson
                                       Case Manager to
                                       Magistrate Judge Laurie J. Michelson